UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                                    :

                                                             :        **NOTICE OF MOTION**

                          -against-                          :        Docket No. 04 Cr 273 (NRB)

CHRISTOPHER COLOMBO,                                         :

                                     Defendant.               :

------------------------------------------------------------------------x


PLEASE TAKE NOTICE that defendant CHRISTOPHER COLOMBO, upon the attached

Memorandum of Law and Exhibits, moves this Court, by his attorney, JEREMY SCHNEIDER,

before the Honorable Naomi Reice Buchwald, at the United States Courthouse, located at 500

Pearl Street, New York, New York, for an order granting the following relief:

1.  Suppressing electronic surveillance evidence pursuant to the Fourth Amendment of the

United States Constitution and 18 U.S.C. §§ 2515 and 2518, or alternatively for a hearing

pursuant to *Franks v Delaware*, 438 U.S. 154 (1978);

2. Granting a hearing to determine the audibility of tapes and the accuracy of line sheets;

3. Directing the Government to transcribe the intercepted communications and categorize

them in specified manners, pursuant to the Due Process Clause and the Sixth Amendment of the

United States Constitution;

4.  Directing the Government to disclose various discovery pursuant to Fed. Rule Crim.

P.16, thirty days before trial, i.e: a list of exhibits expected to be offered during its direct case;

a list of anticipated witnesses; a list of unindicted coconspirators; a summary of expert testimony;

and notice of any uncharged crimes or prior bad acts which it may seek to introduce pursuant to Fed. Rule Evid. 404(b);

5.   Pursuant to *Brady v Maryland,* 373 U.S. 83 (1963), *Giglio v United States,* 405 U.S. 150 (1972) and their progeny, directing the Government to disclose, as soon as it becomes available, any material that is either exculpatory, useful for purposes of cross-examination, or helpful in discovering other material information;

6.   Striking surplusage in the indictment, pursuant to Fed. R. Crim. P. 7(d);

7.   Ruling, *in limine*, that statements contained in the eavesdropping applications, progress reports and line sheets are admissible against the Government, pursuant to Fed. R. Evid. 801;

8.   Granting CHRISTOPHER COLOMBO permission to join all motions on behalf of all co-defendants to the extent such motions are relevant and applicable herein, and are not inconsistent with the relief sought herein; and

9.   Granting such other, further and different relief as this Court may deem just, equitable and proper.

Dated:      New York, New York
            December 30, 2005

Respectfully submitted,

Jeremy Schneider, Esq.
Rothman, Schneider, Soloway& Stern, LLP
Attorneys for Defendant Christopher Colombo
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 571-5500

TO:    Clerk of the Court
       United States District Court
       Southern District of New York
       500 Pearl Street
       New York, NY 10007

       Hon. Naomi R. Buchwald
       United States District Court
       Southern District of New York
       500 Pearl Street
       New York, NY 10007


       Eric Bruce, AUSA
       Benjamin Lawsky, AUSA
       United States Attorney's Office, Southern District
       One St. Andrew's Plaza
       New York, NY 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————X

UNITED STATES OF AMERICA,

       -against-                                                  **Cr. 04-273  (NRB)**

CHRISTOPHER COLOMBO

                       Defendant.

———————————————————————————X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
CHRISTOPHER COLOMBO'S PRETRIAL MOTIONS**


Jeremy Schneider, Esq.
Rothman, Schneider, Soloway& Stern, LLP
Attorneys for Defendant Christopher Colombo
100 Lafayette Street
Suite 501
New York, NY 10013
(212) 571-5500

Of Counsel
James E. Neuman, Esq.

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Point I        THE ELECTRONIC EAVESDROPPING EVIDENCE SHOULD BE SUPPRESSED ON THE GROUNDS THAT: (1) THE INITIAL APPLICATION WAS NOT SUPPORTED BY PROBABLE CAUSE; (2) THE GOVERNMENT FAILED TO ESTABLISH THAT THE WIRETAP WAS NECESSARY; AND (3) THE AGENTS FAILED TO MINIMIZE THE INTRUSION. ALTERNATIVELY, A HEARING SHOULD BE HELD TO DETERMINE WHETHER THE WIRETAP APPLICATION WAS BASED UPON MATERIAL MISREPRESENTATIONS . . . . . . . . . . . 3

Point II      A HEARING SHOULD BE HELD TO DETERMINE THE AUDIBILITY AND INTELLIGIBILITY OF THE TAPES AND ACCURACY OF THE LINE SHEETS . . . . . . . . . . . . . . . . . . . . . . . 28

Point III     PURSUANT TO THE DUE PROCESS CLAUSE AND SIXTH AMENDMENT, THE COURT SHOULD DIRECT THE GOVERNMENT TO TRANSCRIBE ALL OF THE INTERCEPTED COMMUNICATIONS, IDENTIFY THOSE IT DEEMS TO BE EITHER INCULPATORY OR EXCULPATORY, INDICATE WHICH TAPES IT INTENDS TO OFFER INTO EVIDENCE, AND SPECIFY WHICH CONVERSATIONS DEFENDANT EITHER PARTICIPATED IN DIRECTLY OR WAS THE SUBJECT OF DISCUSSION BY OTHERS . . . . . . . . . . 31

Point IV     PURSUANT TO THE FEDERAL RULES, THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE, THIRTY DAYS IN ADVANCE OF TRIAL: (1) ALL EXHIBITS EXPECTED TO BE OFFERED DURING ITS DIRECT CASE; (2) A LIST OF ANTICIPATED WITNESSES; (3) A LIST OF ALL UNINDICTED COCONSPIRATORS; (4) A SUMMARY OF EXPERT TESTIMONY; AND (5) NOTICE OF ANY UNCHARGED CRIMES AND PRIOR BAD ACT EVIDENCE IT MAY SEEK TO OFFER INTO EVIDENCE . . . . . . . . . . 41

Point V      PURSUANT TO *BRADY* AND ITS PROGENY, THE COURT SHOULD DIRECT THE GOVERNMENT TO DISCLOSE, AS SOON AS IT BECOMES AVAILABLE, ANY MATERIAL THAT IS EITHER EXCULPATORY, USEFUL FOR PURPOSES OF CROSS-EXAMINATION, OR HELPFUL IN DISCOVERING OTHER MATERIAL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . 47

Point VI    PURSUANT TO FED. R. CRIM. P. 7(d), THE COURT
            SHOULD STRIKE THE SURPLUSAGE IN THE INDICTMENT
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Point VII   THE COURT SHOULD RULE,    *IN LIMINE,*    THAT THE
            STATEMENTS CONTAINED IN THE EAVESDROPPING
            APPLICATIONS, LINE SHEETS AND PROGRESS REPORTS
            ARE ADMISSIBLE AGAINST THE GOVERNMENT, IN THE
            EVENT    THAT    THEY    CONFLICT    WITH    THE
            GOVERNMENT'S TRIAL ALLEGATIONS        . . . . . . . . 55


Point VIII  DEFENDANT REQUESTS PERMISSION TO JOIN IN THE
            MOTIONS SUBMITTED BY THE CO-DEFENDANTS TO THE
            EXTENT THAT THEY ARE RELEVANT AND APPLICABLE,
            AND FOR ANY OTHER RELIEF THAT THE COURT MAY
            DEEM JUST AND PROPER        . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

## PRELIMINARY STATEMENT

This memorandum is submitted in support of the defendant Christopher Colombo's application for an Order: (1) suppressing wiretapped conversations, or alternatively granting a hearing pursuant to *Franks v Delaware,* 438 U.S. 154 (1978); (2) granting a hearing to determine the audibility of tapes and the accuracy of the line sheets; (3) directing the government to transcribe the intercepted communications and categorize them in specified manners; (4) directing the government to provide various forms of discovery thirty days before trial, including a list of exhibits and witnesses; (5) directing the government to disclose *Brady* material as soon as it becomes available; (6) striking surplusage from the indictment; (7) deciding,   *in limini,* the admissibility of various statements by government agents; and (8) granting permission to join in the motions of the co-defendants to the extent they are applicable.

## FACTUAL BACKGROUND

For purposes of this application, the facts may be summarized readily.  According to the various applications for search warrants and eavesdropping warrants, in October, 1999, members of the Organized Crime Task Force began investigating reports from the Orange County District Attorney's Office that Christopher Colombo (hereinafter "Defendant") and others were conducting an illegal gambling operation in Orange County and elsewhere in the State of New York.  During the initial months, the investigators conducted physical surveillance and reviewed telephone toll records.  In May and June, 2000, various pen register orders were issued.  Sometime during this period, the investigative team also reportedly developed a confidential informant.  *See,* McCabe Search Warrant Affidavit, ¶¶ 8-14.

Eventually, on August 9, 2000, two eavesdropping warrants were issued by New York State judges, authorizing eavesdropping over numerous telephone lines, including one located at Defendant's home.    During the subsequent months, the investigators filed supplemental applications to amend the eavesdropping warrants to authorize eavesdropping over additional phones, and to encompass additional crimes, including usury. *See,* McCabe Search Warrant Affidavit, ¶¶ 17-23. The investigators eventually produced hundreds of line sheets, discussing on thousands of hours of intercepted communications. Subsequently, in May, 2001, a search warrant was signed, authorizing searches of various locations, including Defendant's residence.

The investigation culminated in a 27-count indictment, naming 18 defendants. As the Court has already noted in a prior Order, the counts are organized into five groups: (1) racketeering charges; (2) gambling charges; (3) loansharking charges; (4) extortion and related fraud; and (5) bribery and wire fraud charges relating to a company known as "DoubleClick." *See,* Memorandum and Order, dated November 22, 2005.

As will be explained, *infra,* though, the indictment needlessly includes inflammatory language about the history of the "Colombo Organized Crime Family," including a so-called "bloody internecine war," even though there is no allegation that the enterprise operated under the auspices of that organization or even an allegation that Defendant was a "member" thereof. Further, a review of the wiretap applications and supporting documentation raises serious questions whether the electronic surveillance evidence should be suppressed. Additionally, those documents demonstrate a compelling need for the court to direct certain discovery promptly, and cause for the court to consider the admissibility of various statements in those documents.

-2-

POINT I

**THE ELECTRONIC EAVESDROPPING EVIDENCE SHOULD BE SUPPRESSED ON THE GROUNDS THAT: (1) THE INITIAL APPLICATION WAS NOT SUPPORTED BY PROBABLE CAUSE; (2) THE GOVERNMENT FAILED TO ESTABLISH THAT THE WIRETAP WAS NECESSARY; AND (3) THE AGENTS FAILED TO MINIMIZE THE INTRUSION. ALTERNATIVELY, A HEARING SHOULD BE HELD TO DETERMINE WHETHER THE WIRETAP APPLICATION WAS BASED UPON MATERIAL MISREPRESENTATIONS**

The "bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v Delaware,* 438 U.S. 154 (1978). It is also fundamental that "the Fourth Amendment protects a person's private conversations as well as his private premises." *Alderman v United States,* 394 U.S. 165, 178 (1968). Further, Title III was enacted as an additional safeguard both to protect the privacy of wire and oral communications," as well as a mean of regulating "the use of electronic surveillance evidence obtained by law enforcement under specified conditions." *United States v Lopez,* 300 F.3d 46, 51 (1st Cir. 2002), citing *Bartnicki v Vopper,* 532 U.S. 514, 523 (2001). Thus, Title III considers the interception of electronic surveillance to be an "extraordinary investigative technique whose use 'is to be distinctly the exception not the rule,'" *Lopez,* 300 F.3d at 51, quoting *United States v Hoffman,* 832 F.2d 1299, 1306 (1st Cir. 1987), available only upon satisfaction of strict procedural requirements. Where probable cause is lacking, or those procedural requirements are

not met, the Fourth Amendment and Title III require the exclusion of any evidence "derived from" the illegal wiretap. 18 U.S.C. § 2515.

In this case, as explained *infra, see,* Points II and III, the line sheets of the intercepted communications are so indecipherable and incoherent that they preclude a thorough and complete challenge to the electronic surveillance. Still, when those line sheets are considered along with the initial wiretap application, the subsequent applications and the progress reports, it is apparent that the electronic surveillance evidence must be suppressed for several, distinct reasons: (1) the initial warrant application did not establish the existence of probable cause; (2) the initial application did not establish the "necessity" of electronic surveillance; and (3) proper steps to "minimize" the intrusion were not taken. Alternatively, there is substantial reason to conclude that material misrepresentations were made in the various applications, requiring, at least, a hearing pursuant to *Franks v Delaware,* 438 U.S. 154 (1978).

Probable Cause

The "quantum of probable cause needed for an electronic surveillance authorization order is identical to that of a search warrant." *United States v Gambino,* 734 F.Supp. 1084 (SDNY 1990). Simply put, the issuing judge must have "a substantial basis *** to conclude that [the surveillance will] uncover evidence of wrongdoing." *United States v Biaggi*, 853 F.2d 89, 95 (2nd Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989), quoting *United States v Nersesian,* 824 F.2d 1294, 1306 (2nd Cir.), *cert. denied*, 484 U.S. 958 (1987); *see also, Beck v Ohio,* 739 U.S. 89, 91 (1964) (evidence must be sufficient for a "prudent man" to believe evidence of a crime will be obtained).

When assessing probable cause on a motion to suppress state-issued wiretap evidence, substantial deference is accorded to the issuing judicial officer. *See, United States v Wagner,* 989 F.2d 69, 72 (2nd Cir. 1993).   In making this determination, courts must apply the "totality of circumstances" set forth in *Illinois v Gates,* 462 U.S. 213 (1983).  *See, United States v Rowell,* 903 F.2d 899, 902 (2nd Cir. 1990).  Specifically, the issuing judicial officer must:

> "make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probably that contraband or evidence of a crime will be found in a particular place." *Illinois v Gates,* 462 U.S. at 2332.

When the application is based upon information provided by an informant, the key question usually is whether the information is "reliable." *United States v All Right, Title and Interest in Five Parcels,* 830 F.Supp. 750, 759 (SDNY 1993).  Reliability may be established by the informant's track record, or by proof that his information has been materially corroborated by independent evidence. *See, United States v Wagner,* 989 F.2d at 72-73.

The probable cause necessary to validate a wiretap, naturally, must exist at the time the warrant is issued. *United States v Martino,* 496 F.2d 455, 866 (2nd Cir. 1981).  Thus, "warrant affidavits concerning information months old must show that the information is current and not stale." *United States v All Right, Title and Interest in Five Parcels,* 830 F.Supp. 750, 759 (SDNY 1993).  Whether information is "stale" depends largely upon the nature of the alleged criminal conduct.  Where the affidavits indicate ongoing criminal conduct, rather than isolated illegal acts, the passage of time is less significant. *United States v Hyde,* 574 F.2d 856 (5th Cir. 1978); *Mapp v Warden,* 531 F.2d 1167, 1171-72 (2nd Cir.), *cert. denied,* 429 U.S. 982 (1976).

Here, the initial eavesdropping warrant alleged probable cause that Defendant and others were using designated telephone lines to discuss and engage in various gambling offenses. These allegations, in turn, were premised upon the following assertions: (1) Defendant had a record of gambling offenses and was a known "associate" of organized crime; (2) Defendant had been seen meeting with other known gamblers in the area of a "wireroom"; (3) Defendant and others were in continual telephone contact with each other, evincing a pattern of behavior common to bookmaking and gambling operations; (4) Defendant and others had made many calls to a pizzeria and to a furniture store, suggesting that they were"policy drop locations"; (5) a check made to Defendant had been found on the body of a homicide victim, suggesting that the victim worked for Defendant and the check represented Defendant's share of the profit; and (6) a so-called "middleman" reportedly told a confidential informant that Defendant was the head of a gambling operation.    None of these assertions, though, even when considered together, amounts to probable cause.

With regard to Defendant's record, the application indicates that in 1995, Defendant was arrested for possession of gambling records in the first degree in the Town of Middleton. Evidently as a result of that arrest, in 1996 Defendant pled guilty to promoting gambling in the second degree, a class A misdemeanor, and received a $1,000 fine. *See,* ¶ 22 of Investigator McCabe' Affidavit, dated August 8, 2000 (hereinafter "McCabe Affidavit).   Yet, the affidavit offers no details about those charges.  Without more detail, there is no reason to infer from that incident that Defendant held any position of authority in a gambling or bookmaking operation. Nor can one even assume that Defendant was acting in concert with other individuals as part of a large-scale operation.  Indeed, considering the broad scope of acts covered by the crime of

promoting gambling in the second degree, *see,* Penal Law § 225.05; *People v Corbalis,* 178 N.Y. 516 (1904), the conviction reveals virtually nothing about Defendant's conduct. Thus, the issuing judge could not place great weight on the mere fact that Defendant had once been convicted of a misdemeanor gambling offense. *Cf., Jones v United States,* 362 U.S. 257, 271 (1960).

Indeed, the facts *omitted* from the application suggest that the incident may well have been isolated. Importantly, nowhere in the application does Investigator McCabe disclose that the aforementioned gambling conviction represents Defendant's sole conviction, let alone his sole gambling conviction. Had this information been provided, the judge may well have deemed Defendant's four year old conviction to be "stale" information, too old to be relied upon as proof of continuing criminal conduct. *See generally, United States v Hyde,* 574 F.2d 856, *supra; Mapp v Warden,* 531 F.2d 1167, *supra.*

Surely recognizing the lack of evidence that Defendant had continued to engage in gambling offenses – or even offenses whatsoever – Investigator McCabe placed considerable weight on the claim that Defendant was an "associate" of "the Colombo La Cosa Nostra." McCabe Affidavit, ¶ 25. But that assertion was not supported by any specific claims. Investigator McCabe observed that Defendant was the son of Joseph Colombo, Sr., the alleged "past boss of the Colombo organized crime family in New York." McCabe Affidavit, ¶ 22. He also reported that Defendant's brother, Anthony Colombo, is a "made" member of the family, McCabe Affidavit, ¶ 23. And Investigator McCabe recited detailed claims about the structure of various organized crime entities. McCabe Affidavit, ¶¶ 24, 26. But with regard to Defendant

specifically, Investigator McCabe merely stated that unnamed FBI agents [1] had confirmed that Defendant was an "associate" of the "mafia." McCabe Affidavit, ¶ 25. Thus, McCabe's claim that Defendant was an "associate" of the "Colombo Organized Crime Family" was based on pure, unsubstantiated hearsay.

Indeed, the term "associate" itself is patently dubious. While investigators and prosecutors commonly allege the existence of organized crime families with "made members" and a hierarchical structure, the claim of "association" betrays a "bootstrapping" argument. The implication is that anyone with *any* type of relationship with a "member" of an organized crime family somehow attains a special type of status of "associate" and, consequently, becomes a member of a larger enterprise or conspiracy. But unlike "made members," there is no particular meaning to being an "associate." To put it differently, the label of "associate" cannot be used as a substitute for actual proof of criminality; absent specific detailed information that Defendant had a particular role within the "Colombo Organized Crime Family," therefore, the allegation that he was an "associate" should be disregarded. And the mere fact that Defendant was Joseph Colombo's son obviously does not help establish probable cause.

Perhaps even more important is the paucity of evidence that Defendant had been involved in any gambling offenses, at the time of the initial eavesdropping application. Above all, Investigator McCabe emphasized that Defendant had been in frequent contact with other

---

[1]    Investigator McCabe indicates that Joseph Rauchet, the Deputy Chief Investigator of the Organized Crime Task Force, was Anthony Colombo was listed by the FBI as a "made" member of the Colombo Family, but he does not attribute a similar such claim to Rauchet about Defendant.

individuals who allegedly were known to be involved in gambling, either by personal meetings

or through the telephone.  For example, Investigator McCabe wrote:

> -a male tentatively identified as John Ferrara frequented a "gambling wireroom located at 333 East 116th Street."  McCabe Affidavit, ¶ 27.

> -the investigative team observed Philip Dioguardi in the vicinity of 31st 115th Street and First Avenue, with either Anthony Colombo or Defendant, though none of them reside in that area. McCabe Affidavit, ¶ 28;

> -investigators observed the "Colombos and/or Dioguardi meeting on the street with convicted gamblers****" in the same vicinity. McCabe Affidavit, ¶ 29;

> –insofar as only Ferrara lived in the area and that the others had not been seen conducting "legitimate business" in that area, "it is my opinion that these meetings *** indicate that [Defendant and others] are engaging in gambling-related criminal conduct.    McCabe Affidavit, ¶ 29.

> -investigators saw Dioguardi at the home of Defendant "numerous times a week." McCabe Affidavit, ¶¶ 29, 36;

> -Dioguardi's behavior of meeting Defendant in the morning "is consistent with the conduct of a boss of a gambling operation meeting with and checking on the status of a gambling wireroom with a subordinate during the day to make sure everything is running smoothly. McCabe Affidavit, ¶ 36

> -an analysis of telephone records revealed that the various alleged coconspirators, including Defendant, "were in continual telephonic contact" starting in December, 1999.  McCabe Affidavit, ¶ 31-32, 35-43.

> -many of these calls occurred "between 12:27 p.m. and 6:30 p.m, "during policy and bookmaking hours." McCabe Affidavit, ¶ 35.

> -the various conspirators made telephonic contact and visited the Little Italy Delicatessen in the Town of Monroe. McCabe Affidavit, ¶¶ 41-42.

-"These frequent and consistent telephonic contacts between the targets' telephone lines **** are consistent, in my experience, with bookmaking practices where the individual in charge with the wireroom *** is constantly required to report the day's debt collections and the wireroom's progress to the middleman *** and in some case, to the boss, the Colombo brothers." McCabe Affidavit, ¶ 32.

-the timing of other calls, early in the morning and late at night, reveals that "Dioguardi is discussing the day's activities with the Colombos and seeing if they have any specific instructions for him. McCabe Affidavit, ¶ 37.

Upon close examination, the leaps of logic in these statements are nothing short of breathtaking. Investigator McCabe assumed that, simply because Defendant and others are meeting in the general vicinity of a reported wireroom without any other *known* reason for being in that area, it followed that they are necessarily engaged in criminal activities. But plainly there are countless innocent reasons for people to meet in a residential or business area, notwithstanding the presence of a so-called wireroom within a few blocks. Similarly, he implied that frequent telephonic contact during ordinary business hours is evidence of gambling and bookmaking activities, or that it is at least "consistent" with such conduct. But mere "consistency" with criminal conduct is hardly equivalent to evidence of actual criminal conduct such as to merit a warrant. And while McCabe contended that the timing of calls during ordinary business hours is indicative of gambling operations, one could just as easily argue that the timing of calls suggests discussions of *legal* business operations.

Concededly, the opinions of government agents are relevant in ascertaining whether probable cause exists. *See generally United States v Fama,* 758 F.2d 834, 838 (2nd Cir. 1985). But accepting Investigator McCabe's aforementioned opinions is tantamount to exercising no genuine judicial oversight at all. *See generally, United States v Abou-Saada,* 785 F.2d 1, 11 [1st

Cir.] *cert. denied,* 477 U.S. 908 (1986).  For even a lay person would recognize that Investigator McCabe's *factual* assertions indicated merely that Defendant was in frequent contact with individuals who allegedly had a connection with gambling or bookmaking, and did not support his much broader opinions.

Aside from the generalized discussions about telephonic contact and personal meetings, Investigator McCabe made several far-reaching claims about certain alleged gambling or bookmaking spots.  For example, Investigator McCabe noted that Dioguardi and Ferrara were seen entering and leaving a bodega on 115th Street, empty-handed; consequently, he concluded that they must have been checking on potential gambling locations.  McCabe Affidavit ¶ 43.  Yet, according to this logic, it is difficult to imagine any location which would not fall under suspicion.  Similarly, Investigator McCabe claimed that, because numerous phone calls were made to a pizzeria during over several months, and the defendants were seen frequenting that pizzeria, it followed that the pizzeria must be a "policy-drop location."  McCabe Affidavit, ¶¶ 58-59.  But one could just as readily conclude that the pizzeria was merely a place for socializing.  Further, Investigator McCabe observed that numerous calls were made every day to the Sarbens Furniture Corp. in the Bronx.  Because of the frequency of the calls, and the fact that the location was a small storefront, McCabe reasoned that it must be a location for the gambling operation to "lay-off" their bets.  McCabe Affidavit, ¶¶ 44-45.  But this opinion, too, was patently speculative.

Somewhat more tantalizing was Investigator McCabe's information that a check made payable to Defendant had been found on the body of a homicide victim "several years ago."  McCabe Affidavit ¶ 46.  Reportedly, a retired officer who was convicted of the homicide years ago, Raymond Marguilies, admitted that he had shot the victim because he owed the victim

$35,000 in gambling debts. McCabe Affidavit ¶ 46. Inside the victim's pocket was a check made payable to Defendant from RAM Furniture Store in the Bronx, which was owned by Marguilies. When interviewed by the police, Marguilies indicated that Defendant was an outside furniture salesman and that the check was for commissions Defendant had earned. McCabe Affidavit ¶ 46. Noting that the surveillance team had never observed Defendant involved with the furniture business, McCabe inferred that RAM Furniture must have been a "policy" operation, that the homicide victim likely worked for Defendant and that the check was supposed to be a payment to Defendant for his profit in the "weekly take." McCabe Affidavit ¶ 47.

The main problem with the information pertaining to RAM Furniture, though, is that it is based on conduct occurring at least "several years ago." As such, the information is "stale" and too far removed to be relied upon for purposes of authorizing a wiretap. *See generally, United States v Hyde, supra; United States v Martino, supra; Mapp v Warden, supra.*

Probably the most substantive allegation in the entire affidavit is that concerning the confidential informant, who reportedly owed a gambling debt to Paul Seipman. According to McCabe, the informant told him that Seipman had informed him that Defendant was the "head of the gambling operation." McCabe Affidavit, ¶ 49. In May, 2000, the informant wore a tape-recording device and recorded a conversation during which Seipman referred to the informant's debt and evidently referred to a sheet of paper containing numbers. McCabe Affidavit, ¶ 50. In addition, several calls were reportedly made between Seipman and Defendant before and after that meeting. McCabe Affidavit, ¶ 51. In June, Seipman and the informant discussed the debt during another tape-recorded call. McCabe Affidavit, ¶ 53. Based on these facts, Investigator McCabe

concludes that Seipman must be a middleman for Defendant, the alleged boss. McCabe Affidavit, ¶ 51.

Crucially, however, there is no basis in the application to *credit* the informant's allegation that Seipman characterized Defendant as "the head of the gambling operation." McCabe's affidavit is literally devoid of any information purporting to demonstrate that the informant has any history of reliability. *See generally, United States v Wagner,* 989 F.2d at 72-73, *supra*; *United States v All Right, Title and Interest in Five Parcels,* 830 F.Supp. at 759, *supra.* And while the tape recordings might be construed as corroboration that Seipman was involved in a gambling or bookmaking operation, they do not corroborate the informant's claim about Defendant. In other words, the application does not corroborate the informant's claims in any material sense.

Briefly put, in order to allege probable cause, the eavesdropping allegation relied upon a combination of outdated information, unsupported opinions, uncorroborated claims from an informant and evidence that Defendant and others were in frequent contact with individuals who allegedly had histories of involvement with gambling and bookmaking operations. Because these claims – even considered together – do not demonstrate probable cause, all evidence derived from the wiretaps should be suppressed.

Necessity

A distinct ground for suppression is the fact that the government never established the necessity of the wiretaps. 18 U.S.C. § 2518(1)(c) requires the government to provide a "full and complete statement as to whether or not other investigative measures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *See*

-13-

*also,* 18 U.S.C. § 2518(3)© (requiring the issuing court to make a finding that "normal investigative techniques" have been tried and failed, or unlikely to succeed). The "necessity" requirement arises from the Fourth Amendment jurisprudence holding that courts should authorize "no greater invasion of privacy... than necessary under the circumstances." *Berger v State of N.Y.,* 388 U.S. 41, 57 (1967); *see also, Katz v United States,* 389 U.S. 347 (1973).

Thus, the statute is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v Kahn,* 415 U.S. 143, 153 p.12 (1974); *see also, United States v Giordano,* 416 U.S. 505 (1974); *United States v London,* 66 F.3d 1227, 1237 (1st Cir. 1995). Such traditional investigative techniques include, *inter alia*:

> "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants."*VanMeter,* 278 F.3d 1156-1163-64 (10th Cir. 1002).

Where those traditional techniques have not been attempted, the government must "explain that failure with particularity." *United States v Cline,* 349 F.3d 1276, 1280 (10th Cir. 2003). It is therefore insufficient to recite mere generalities or conclusory statements without detailed factual support. *Id; see also, United States v Lopez,* 300 F.3d 46, 53 (1st Cir. 2004).

Unlike some of the statutory provisions, the requirement for a "full and complete statement" about the failure to utilize other investigative procedures is "absolute." *United States v Salemme,* 978 F.Supp. 343, 348 (D. Mass. 1997). Suppression may be required where applications are incomplete or misleading in this regard, as the "constitutionality of Title III relies

in meaningful measure on the process it provides for an independent judicial officer, rather than a law enforcement officer *** to decide that electronic surveillance is necessary ****" *Id.; see also, Steagald v United States,* 451 U.S. 204, 212 (1981); *Johnson v United States,* 333 U.S. 10, 14 (1948).

Still, "these statutory conditions are 'far from an insurmountable hurdle,' and require only that the Government demonstrate 'that normal investigative techniques would prove difficult ... [and not] that any other option would be doomed to failure.'" *United States v Pappas,* 298 F.Supp.2d 250 (D.Conn. 2004), quoting *United States v Bellomo,* 954 F.Supp. 630, 638-39 (S.D.N.Y. 1997). Exhaustion of every other investigative method is not demanded as a prerequisite to electronic surveillance. *United States v Young,* 822 F.2d 1234, 1237 (2nd Cir. 1987). When reviewing "necessity," courts employ a "common sense approach" to evaluate the reasonableness of the government's claims. *United States v Gonzalez,* 412 F.3d 1102, 1112 (9th Cir. 2005).

Here, Investigator McCabe asserted that, while it was reasonable to conclude that the defendants were using various telephone lines to engage in illegal bookmaking activity, there was still a "vast amount of information" that could not be learned without court-authorized eavesdropping. McCabe Affidavit, § 68. Among other things, he said that the wiretap was necessary to learn the number of wirerooms reporting to the defendants; the dollar amounts involved in the gambling operations; the number of wagers being accepted; the amount of bets; and other partners and workers. McCabe Affidavit, § 68. "Conventional surveillance techniques" reportedly had been unsuccessful in achieving all of the objectives of this investigation." McCabe Affidavit, § 70.

In this regard, Investigator McCabe elaborated that:

> -investigators had conducted surveillance of the residences of the defendants, but they had only resulted in the observations of Dioguardi's automobile at the residence of one of the Colombo brothers and a meeting with Ferrara;
>
> -they had been unable to conduct "overhears" at any location, including the location of the original wireroom, which had moved;
>
> -attempts to "overhear" may jeopardize the investigation, as the Colombo residences are located in a rural area and a "tight-knit" neighborhood;
>
> -Dioguargi is never home, so attempts to overhear his house would not further the investigation;
>
> -though the confidential informant had provided some information, there was "little more" that could be "accomplished by his/her information or actions," since the CI "does not have knowledge or information relating to the full extent of this illegal gambling operation. And because the CI fears for his safety, he is not willing to testify against anyone. McCabe Affidavit §§ 65, 70-71.

Similarly, in her supporting affidavit, Assistant Deputy Attorney General Meryl Lutsky stated that: the informant and other potential witnesses would likely not testify before a grand jury; approaching known accomplices might alert others to the investigation; surveillance of residences was of limited use; and that the government was unaware of undercover officers who could approach the subjects. Lutsky Affidavit, pp. 8-11.

Even if true, however, these assertions fall far short of establishing that "ordinary investigative methods" would not suffice to uncover evidence of criminality. *United States v Gonzalez,* 412 F.3d 1101, *supra,* is illustrative. There, the government also claimed that physical surveillance was not likely to yield all of the desired information. The court responded:

> "although the affidavit claimed that neither physical nor video surveillance was likely to produce useful

-16-

> information **** we cannot accept this as evidence
> that such surveillance was reasonably unlikely to
> bear fruit.  Surely surveillance is not completely
> unsuccessful if it does not decipher what an
> individual is writing while she sits at her desk ****
> it is still reasonable to conclude that video or
> physical surveillance could have identified
> individuals **** coming and going from the office.
> This information certainly would have assisted law
> enforcement in discovering the identifies of
> 'members of the criminal enterprise and aiders and
> abettors ***" 412 F.3d at 1114.

Similarly, even if the surveillance here would not, as McCabe and Lutsky alleged, have allowed

the investigators to overhear details of conversations, it surely would have assisted in the

identification of other accomplices.  And once other accomplices had been identified, it may well

have been possible to approach some of them about cooperating.  To put it differently, just

because a particular investigative technique would not, in itself, have fulfilled all of the goals of

the investigation, is not an excuse to forego that technique entirely.

Further, little weight should be given to the conclusory remarks that grand jury subpoenas

would likely have been counterproductive.  These kinds of remarks are simply "boilerplate

conclusions that merely describe inherent limitations of normal investigative procedures." *United

States v Blackmon,* 273 F.3d 1204, 1210-11 (9th Cir. 2001).  In other words, the claims that it

would have been unduly risky to pursue further leads through a grand jury could be applied

equally to any organized crime investigation.  As the Tenth Circuit has observed, this type of

logic is unavailing:

> "Applying 'common sense,' we note that wiretapping is normally
> the safest and most efficacious way for law enforcement officers to
> gain useful information about a suspected drug conspiracy.
> However, we have declined to deduce from this 'common sense'
> observation any *per se* rule that wiretapping is always 'necessary'

> when there is probable cause to believe that the suspects are engaged in a drug conspiracy." *United States v Castillo-Garcia,* 117 F.3d at 1195, *supra.*

Accordingly, arguments about necessity do not suffice when they are based on factual allegations of risk that could apply to virtually any investigation. *Id; see also, United States v Ippolito,* 774 F.2d 1482, 1486 (9th Cir. 1985) (government must show that normal investigative techniques would fail in a particular case, not just classes of cases); *United States v Lilla,* 699 F.2d 99 (2nd Cir. 1983).

In this case, it is not apparent from the wiretap application why additional surveillance could not have been undertaken of the various locations alleged to be centers of gambling and bookmaking activities. Nor is there any explanation why the confidential informant could not have introduced a undercover agent to Paul Seipman, or any of the other alleged co-conspirators. Regardless of whether the informant was truly afraid to testify, the application indicates that he was perfectly willing to wear a tape recording device on several occasions when talking to Seipman, who was allegedly a "middleman" in direct contact with Defendant. Certainly, there was no greater danger to the informant if he had introduced an undercover to Seipman. And if, as the application claims, the informant incurred a gambling debt to the defendants, then he should have been able to introduce an undercover to the same people to whom he placed the bets.

Because the wiretap application failed to meet the "absolute" requirement that the government set forth a full and complete statement as to why the wiretap was necessary, therefore, all of the evidence derived from the wiretap must be suppressed.

*Franks* Hearing

As noted earlier, the wiretapping statute and the Warrant Clause of the Fourth Amendment demand that an issuing court *independently* determine whether the investigators have met the requirements of setting forth probable cause and necessity. *See generally, United States v Abou-Saada,* 785 F.2d at 11, *supra.* Such independent review assumes that the factual allegations will be *truthful. See, United States v Guerra-Marez,* 496 F.2d at 670, *supra,* quoting *Franks v Delaware,* 438 U.S. 154, 164-65 (1978). Indeed, "the constitutionality of Title III relies in meaningful measure on the process it provides for an independent judicial officer, rather than a law enforcement officer engaged in the competitive business of fighting crime, to decide that electronic surveillance is necessary, and therefore reasonable, in a particular case." *United States v Salemme,* 978 F.Supp. at 348-49, *supra.* And "it would be an unthinkable imposition upon the [issuing judge's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Franks v Delaware,* 438 U.S. at 165, *supra.*

Because of this need for independent review, intercepted communications will be suppressed where the warrant was necessarily based upon false statements or the omission of "material" information that were either made or omitted intentionally, or made or omitted with "reckless disregard." *See, United States v Grant,* 218 F.3d 72, 76 (1st Cir. 2000); *United States v Simpson,* 813 F.2d 1462, 1471-72 (9th Cir. 1987). "Reckless disregard" occurs when the affiant "in fact entertained serious doubts as to the truth of his" allegations. *St. Amant v Thompson,* 390 U.S. 727, 731 (1968). "'Material information' is information which reasonably might have prompted a district judge being asked to issue the warrant to have denied the request." *United*

*States v Ferrara,* 771 F.Supp. 1266, 1305 (D. Mass. 1991).  Thus, recklessness may be inferred

from the omission of information where the omitted material would have been "clearly critical"

to the finding of probable cause. *United States v Reivich,* 793 F.2d 957, 961 (8th Cir. 1980).

To warrant a hearing on the ground that the warrant application was misleading, the

defendant must make a "substantial preliminary showing" that the warrant application contained

"deliberate falsehood" or "reckless disregard for the truth." *Franks v Delaware,* 438 U.S. at

171, *supra,* either by citing material misrepresentations or material omissions. *See, United States*

*v Shryock,* 342 U.S. 948, 977 (9 [th] Cir. 2003), *cert. denied,* 541 U.S. 965 (2004).  It is not

necessary at the initial pleading stage, though, to set forth "clear proof of deliberate or reckless

omissions or misrepresentations." *United States v Gonzalez,* 412 F.3d at 1111, *supra.*  Notably,

"[b]ecause states of mind must be proved circumstantially, a fact finder may infer reckless

disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations."

*United States v Williams,* 737 F.2d 594, 602 (7th Cir. 1984).  The defendant, though, bears the

ultimate burden of proving affirmative misrepresentations or material omissions by a

preponderance of the evidence. *United States v Colkley,* 899 F.2d 297, 300 (1st Cir. 1986).  Once

false statements have been established, the reviewing court must determine whether the remaining

aspects of the warrant affidavit would have sufficed to establish probable cause.  *See, United*

*States v Ozar,* 50 F.3d at 1443 and 1145-46, *supra.*

In this case, there are several reasons to question whether the initial eavesdropping

application was intentionally or recklessly misleading.  First, as mentioned earlier, the affidavit

relies heavily on the fact that Defendant was once convicted of a gambling misdemeanor offense,

but nowhere in the application does Investigator McCabe disclose that the aforementioned

gambling conviction represents Defendant's sole conviction. This information was significant insofar as it seriously undermined the allegation that Defendant had been continuously involved in gambling offenses.

In addition, while Investigator McCabe emphasizes that Defendant is the son of Joseph Colombo, the reputed former boss of the "Colombo crime family," he never informs the court of other history of the family, which arguably would have cast doubt on the suggestion that Defendant was involved in a large-scale gambling and bookmaking operation. According to the indictment, several years after Joseph Colombo's death, two factions of the "Colombo Organized Crime Family" engaged in a "bloody internecine way" over control of the family. Both Anthony Colombo and Defendant were said to be in the losing faction and "no longer involved in the day-to-day operations of the Colombo Organized Crime Family." Indictment, ¶ 9. Though this information was deemed important enough to be included in the indictment, it was not considered significant enough to merit inclusion in the warrant application. But in fact, the information actually was more important for purposes of the warrant; for the entire premise of the warrant was the dubious assertion that Defendant's history and connection to gambling figures permitted the inference that his more recent conduct was suspicious. Further, Investigator McCabe's affidavit implies that Defendant held some official position within the "Colombo Organized Crime Family," which simply is not true; as explained previously, Investigator McCabe's use of the term "associate" is misleading by implying Defendant enjoyed a formal role in any enterprise.

Thus, there are tangible reasons for questioning whether the court would have issued the warrant, had the supporting affidavit been complete and thorough. Accordingly, a hearing should be granted pursuant to *Franks v Delaware*. *Compare, United States v Perez,* 247 F.Supp.2d 459

(S.D.N.Y. 2003) (once the affidavit was corrected by removing false statements and including critical information, it no longer established probable cause); *United States v Gonzalez,* 412 F.3d at 1110, *supra* (defendants were entitled to a      *Franks* hearing where they showed that the affidavits, *inter alia,* inaccurately portrayed the access of the confidential informants, misrepresented the ability of the government to place an undercover agent in the wiretapped office and misrepresented that further physical surveillance was highly likely to be compromised); *United States v Salemme,* 978 F.Supp. at 350-51, *supra* (defendants were entitled to a hearing by showing that the application did not disclose that certain individuals had been cooperating with the FBI during the relevant period); *see also, United States v Simpson,* 813 F.2d 1462 (9th Cir. 1987); *United States v Ippolito,* 774 F.2d 1482 (9th Cir. 1985).[2]

Minimization

Finally, a substantial issue exists as to whether the minimization requirements were met. 18 U.S.C.§ 2518(5) mandates that eavesdropping orders "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." "The minimization requirement 'spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects.'" *United States v Lopez,* 300 F.3d at 57, *supra,* quoting *United States v Hawkins,* 279 F.3d 83, 85 (1st Cir.

---

[2]     As discussed *infra* in Point IV, the poor condition of the line sheets prevents the defense from arguing that the subsequent applications for extensions and amendments of the warrant contained misleading information. The line sheets are simply too incomprehensible to verify whether the extension applications and progress reports suffer from material misrepresentations.  For the same reason, the defense cannot be certain whether there are additional arguments that could be made about improper attempts at "minimization."

2002). When attempting to meet its obligation to minimize unauthorized communications, "'the government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required.'" *United States v Charles*, 213 F.3d 10, 22 (1st Cir.), *cert. denied*, 531 U.S. 915 (2000), quoting *United States v Uribe*, 890 F.2d 554, 557 (1st Cir. 1989).

In *Scott v United States*, 436 U.S. 128, 139 (1978), the Supreme Court indicated that the government's minimization efforts should be evaluated on a case by case basis. *See also, United States v Napolitano*, 552 F. Supp. 465, 476 (S.D.N.Y. 1979). Relevant considerations include: the number of targeted individuals; the ambiguity of the intercepted conversations; the complexity of the acts and nature of the suspected crimes; the thoroughness of the government's precautions to bring about minimization; and the degree of judicial supervision over the surveillance process. *See, United States v Ozar*, 50 F.3d at 1147, *supra; United States v London*, 66 F.3d 1227, 1236 (1st Cir. 1995); *United States v Garcia*, 785 F.2d 214, 224 (8th Cir.), *cert. denied*, 475 U.S. 1143 (1986).

Further, the Second Circuit has held that the stricter state law standards regarding minimization apply, where the wiretap was authorized by a state court order, as here. *See, United States v Vario*, 943 F.2d 236, 244 (2nd Cir. 1991), *cert. denied*, 502 U.S. 1036 (1992). In New York, "the primary question is whether, realistically considered, there was a good faith effort to avoid intercepting conversations unrelated to the crimes being investigated by the terms of the authorizing court order." *United States v All Right, Title and Interest in Five Parcels of Real Property*, 830 F. Supp. at 754, *supra*, citing *People v Brenes*, 42 N.Y.2d 41 (1977). For example, if patterns of non-pertinent calls emerge, their interception, even if legitimate at the

outset, would eventually be deemed illegitimate. *See, United States v Feola,* 651 F.Supp. 1068, 1098 (2nd Cir. 1987), *aff'd without op.,* 875 F.2d 857 (1989).

Because the reasonableness of eavesdropping is "inherently factual," courts have remarked that such an inquiry is "particularly inappropriate for a motion to dismiss." *United States v All Right, Title and Interest in Five Parcels of Real Property,* 830 F. Supp. at 754, *supra.* But where the obligation to minimize is flagrantly violated, numerous courts have indicated that suppression of all of the intercepted conversations may be the appropriate remedy. *See e.g., United States v Turner,* 528 F.2d 143, 156 (9th Cir.), *cert. denied,* 423 U.S. 996 (1975); *United States v Principie,* 531 F.2d 1132 (2nd Cir. 1976), *cert. denied,* 430 U.S. 905 (1977); *United States v Giordano,* 469 F.2d 522 (4th Cir. 1972), *aff'd on other grounds,* 416 U.S. 505 (1974); *cf., United States v Chavez,* 416 U.S. 562 (1974); *United States v Donovan,* 429 U.S.413 (1977).

In this case, Assistant Deputy Attorney General Meryl Lutsky apparently provided written minimization instructions to the officers assigned to conduct the electronic surveillance. According to the documentation provided to the defense, these instructions included direction that, *inter alia:* they should monitor and record only conversations regarding specified crimes and involving specified individuals; they could briefly monitor and record conversations which do not involve any named subjects order to determine the identity of the parties and determine whether the conversations related to a crime under investigation, but that such interception would have to cease after 30-90 seconds if it did not relate to the crime, and that only "spot monitoring" could occur during that call subsequently; if a "pattern of innocence" was determined to exist, then all monitoring and recording of those individuals would have to stop; and that they could not listen to any communication involving any of a number of legal privileges.

-24-

By its terms, these instructions were not patently unreasonable. But the line sheets – to the extent that they are at all intelligible – raise serious questions whether the instructions were actually followed. Each line sheet report includes a first page, with spaces at the bottom to record three sets of numbers for that particular date: the number of intercepted calls, the number of incriminating calls and the number of persons not previously interrupted. And those numbers alone are troubling. Basically, the line sheets repeatedly indicate that a tiny percentage of the calls were classified as "incriminating."

Consider the following line sheets (annexed hereto collectively as Exhibit "A"), selected from a random 24 day period in October, 2000:

-10/1/00: 43 intercepted calls; no incriminating calls; no new persons intercepted
-10/2/00: 36 intercepted calls; 1 incriminating call; no new persons intercepted
-10/3/00: 38 intercepted calls; 2 incriminating calls; no new persons intercepted
-10/4/00: 28 intercepted calls; 2 incriminating calls; no new persons intercepted
-10/5/00: 19 intercepted calls; no incriminating calls; no new persons intercepted
-10/6/00: 51 intercepted calls; no incriminating calls; no new persons intercepted
-10/10/00: 36 intercepted calls; no incriminating calls; no new persons intercepted
-10/11/00: 32 intercepted calls; no incriminating calls; no new persons intercepted
-10/13/00: 32 intercepted calls; no incriminating calls; no new persons intercepted
-10/14/00: 26 intercepted calls; 1 incriminating call; no new persons intercepted
-10/16/00: 33 intercepted calls; 1 incriminating call; no new persons intercepted
-10/17/00: 38 intercepted calls; no incriminating calls; no new persons intercepted
-10/18/00: 36 intercepted calls; no incriminating calls; no new persons intercepted
-10/19/00: 60 intercepted calls; 1 incriminating call; no new persons intercepted
-10/20/00: 28 intercepted calls; no incriminating calls; no new persons intercepted
-10/21/00: 21 intercepted calls; 1 incriminating call; no new persons intercepted
-10/22/00: 26 intercepted calls; 1 incriminating call; no new persons intercepted
-10/24/00: 35 intercepted calls; no incriminating calls; no new persons intercepted

-25-

Thus, during this period the officers intercepted 575 calls, of which only 10 were deemed "incriminating."[3] Also, during this period, the officers reportedly      <u>never</u> intercepted calls involving any new individuals.

The question that immediately arises is: if 565 out of 575 non-incriminating calls (over 98%) does not amount to a "pattern of innocence," then what percentage possibly could? *Compare, People v Holder,* 69 Misc.2d 863 (Nassau County Ct. 1972) (suppressing where fewer than 10% of the intercepted calls were relevant to the conspiracy); *People v Castania,* 73 Misc.2d 166 (Monroe County Ct. 1973) (minimization had not been achieved where 23.6% of calls were pertinent); *United States v Ianiello,* 621 F.Supp. 1455, 1470 (S.D.N.Y. 1985) (no suppression where 80% of calls regarding contested period related to narcotics); *United States v Manfredi*, 488 F.2d 588 (2nd Cir. 1973) (no suppression where 800 of 1000 calls were not pertinent).  While "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer" with regard to minimization, *Scott v United States,* 436 U.S. 128, 140 (1978), there is also no question that such percentages are an important factor. *Id; see also, United States v Gray,* 372 F.Supp.2d 1025 (N.D. Ohio 2005).

In fact, the aforementioned numbers from the selected line sheets establish that the officers themselves should have concluded that there was no reason to continue intercepting calls.  And a review of the remaining line sheets is quite similar; throughout the period of interception, virtually no incriminating calls were intercepted.  Nonetheless, none of the investigators deemed such a record to constitute a "pattern of innocence," justifying the termination of the surveillance.

---

[3]     These figures do not account for several October line sheets, which either reflect that no communications were intercepted or which neglect to include any numbers whatsoever.

And it is also somewhat suspicious that the officers report that they never intercepted any calls from new individuals during that period.

Of further importance is the fact that the line sheets do not clearly indicate whether the officers stopped monitoring or recording the non-pertinent calls once it became clear that they were unrelated to with criminal activity.  Unlike the typical surveillance, the line sheets here do not set forth how long the officers recorded the non-pertinent calls.  Though Deputy Attorney General Lutsky instructed the officers to terminate the calls within two minutes, the line sheets simply do not establish that they followed those instructions.  *Compare, United States v Small,* 229 F.Supp.2d 1166, 1207 (D. Col. 2002) (citing evidence that officers ceased listening to the non-pertinent calls within two minutes 77% of the time).

Accordingly, the line sheets constitute *prima facie* evidence that the officers did not abide by the rules of the Organized Crime Task Force to cease monitoring and recording when a "pattern of innocence" emerged.  Considering how the requirement of minimization was so blatantly ignored, the appropriate remedy would be to suppress all evidence derived from the wiretap.  At the least, a hearing should be conducted on this ground.

## POINT II

## A HEARING SHOULD BE HELD TO DETERMINE THE AUDIBILITY AND INTELLIGIBILITY OF THE TAPES AND ACCURACY OF THE LINE SHEETS

It is settled that tape-recorded statements should not be admitted into evidence where the "unintelligible portions are so substantial as to render the recording as a whole untrustworthy ***." *United States v Arango-Correa*, 851 F.2d 54, 58 (2nd Cir. 1988), quoting *United States v Bryant*, 480 F.2d 785, 790 (2nd Cir. 1973). Tapes will be admitted despite some ambiguity or inaudibility, however, as long as the recordings remain "probative." *United States v Arango-Correa*, 851 F.2d at 58, *supra*. The question is whether the tapes are sufficiently clear as to permit the jury to come to a reasoned conclusion as to what statements were actually made. "The determination of admissibility must be made outside the presence of the jury, and after an objection is made by the defendant." *United States v Tymes*, 1999 WL 34971, *7 (N.D.N.Y. 1999); *accord, United States v Desantis*, 802 F. Supp. 794, 799 (E.D.N.Y. 1992); *United States v Marrapese,* 486 F.2d 918, 921 (2nd Cir. 1973).

Here, the government has yet to identify which tapes it intends to offer into evidence, thereby preventing the defense from contesting the audibility of any specific tapes. Still, a random review of the tapes indicates that the quality is quite uneven. A number of tapes suffer from considerable background noise and overlapping conversations. Under these circumstances, the prudent approach is to conduct a hearing, so that the Court can make an independent determination whether any tapes the government intends to offer into evidence are sufficiently audible to be deemed "probative."

A related problem which is even more readily apparent is that substantial portions of the line sheets are indecipherable, because the notations are either illegible or faded beyond recognition. This problem cannot be conveyed fully without attaching the entire collection of line sheets. In order to demonstrate the breadth of the problem, though, we have selected at random thirty-five pages of line sheets, corresponding to interceptions between January 16, 2001 and January 27, 2001 (annexed hereto collectively as Exhibit "B"). Of that selection, about half of the pages contain writing that is so faded that it is impossible to read. Importantly, these line sheets represent the best version of the line sheets made available to the defense; the line sheets were provided to the defense in electronic form, and they appear the same whether printed out or viewed on a computer monitor. Thus, it appears that even the original line sheets may be equally faded and unreadable.[4]

In any event, separate from the problem that the ink is too faded to read, the line sheets are also replete with illegible notation . Of the 35 pages of line sheets concerning interceptions between January 16, 2001 and January 27, 2001, at least ten – not counting the sheets already singled out as too faded to read – contain numerous entries that are so illegible as to be useless. Many other entries on those sheets contain abbreviations which are meaningless because they lack any explanation. And evidently    none of the entries constitute verbatim accounts of the conversations.

Because such a high percentage of the line sheets are unintelligible, it is impossible to have confidence in their accuracy. Moreover, there is no basis from the line sheets to infer that the

_____

[4]    The fact that the co-defendants have raised similar objections to the line sheets suggests that the problem may well be with the original version of the line sheets.

audiotapes are actually audible. Simply put, the line sheets are so unintelligible that do not even amount to clear *allegations* that the intercepted communications pass the minimum threshold of audibility. And without unequivocal assertions from the government that the intercepted communications are largely audible, a hearing must be conducted.

For all these reasons, the Court should conduct a hearing both to assess the audibility of the tape recordings, and to assess the accuracy and intelligibility of the line sheets.

**POINT III**

**PURSUANT TO THE DUE PROCESS CLAUSE AND SIXTH AMENDMENT, THE COURT SHOULD DIRECT THE GOVERNMENT TO TRANSCRIBE ALL OF THE INTERCEPTED COMMUNICATIONS, IDENTIFY THOSE IT DEEMS TO BE EITHER INCULPATORY OR EXCULPATORY, INDICATE WHICH TAPES IT INTENDS TO OFFER INTO EVIDENCE, AND SPECIFY WHICH CONVERSATIONS DEFENDANT EITHER PARTICIPATED IN DIRECTLY OR WAS THE SUBJECT OF DISCUSSION BY OTHERS**

As the co-defendants have observed in their pretrial motions, the government has provided the defense with hundreds of tape recordings, covering thousands of hours of intercepted conversations. The government has also provided numerous progress reports and thousands of pages of line sheets, each of which summarizes multiple conversations. Yet, the government has not attempted to describe each intercepted conversation, categorize them in any manner or identify which are deemed inculpatory or exculpatory. In effect, the defense has been "buried in paper," preventing counsel from effectively preparing for trial, or even from effectively presenting pretrial motions. Accordingly, the government should be directed to transcribe *all* of the intercepted communications verbatim, identify which tapes it intends to offer into evidence, specify all instances where the defendants participate in conversation or are mentioned by others and indicate which conversations it deems inculpatory or exculpatory.

Although the Constitution does not expressly require pretrial discovery in criminal cases, *see e.g., DeVita v Sills,* 422 F.2d 1172, 1181 (3rd Cir. 1970), certain constitutional provisions have been interpreted as imposing a duty of disclosure upon the government. Thus, the Due Process Clause requires the government to disclose material evidence, favorable to the defense,

-31-

even if not specifically requested by the defense. *See, United States v Agurs,* 427 U.S. 97, 107 (1973); *Brady v Maryland,* 373 U.S. 83, 87 (1963) . Whether or not the evidence is admissible under evidentiary rules, "*Brady* material must be disclosed in time for its effective use at trial," *In Re United States (Coppa),* 267 F.3d 132, 142 (2nd. Cir. 2001). Indeed, "this disclosure requirement imposes a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Titsworth v Dretke*, 401 F.3d 301, 306 (5th Cir. 2005). *Brady* material must be disclosed "at a time when disclosure would be of value to the accused." *United States v Gordon,* 844 F.2d 1397, 1403 (9th Cir. 1988).

Similarly, the Sixth Amendment contains separate guarantees of effective assistance of counsel, confrontation and compulsory process. Counsel is ineffective where he neglects to take the necessary steps to investigate and discover important trial materials. *See generally, People v Droz,* 39 N.Y.2d 457, 462 (1976). And a defendant is deprived of his right of confrontation and compulsory process when he is unreasonably precluded from obtaining and introducing material evidence. "Whether rooted directly in the Due Process Clause *** or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v Scheffer,* 523 U.S. 303, 329 n.16 (1998); *see generally, Chambers v Mississippi,* 410 U.S. 284, 294 (1973); *compare, United States v Carter,* 313 F. Supp.2d 921, 923 (E.D. Wisc. 2004) (noting that the Sixth Amendment does not compel discovery of all material that might aid in cross-examination, but that the Due Process Clause does afford defendants a right to disclosure of information that concerns the credibility of key witnesses).

In brief, the Supreme Court has repeatedly recognized that the guarantees encompassed in various constitutional provisions cannot be vindicated without at least some degree of pretrial discovery. And for the same reason, the federal statutes and rules set forth procedures enabling the defense to obtain specific types of information at various stages of the proceedings. *See e.g,* Fed. R. Crim. P. 16 (entitling the defendant to discover and inspect different items); Fed. R. Crim. P. 7(f) (concerning a bill of particulars); 6 Fed. Rules of Evid. 404(b) (requiring the government to provide notice of uncharged crimes and bad acts it intends to introduce); 18 U.S.C. § 3500 (requiring disclosure of statements and reports).

It is in this context that a number of courts have criticized prosecutors who attempt to "bury the defendant in paper" by simply making all documents available, without organizing them in some more utile manner. For example, in *United States v Turkish,* 458 F. Supp. 874 (S.D.N.Y. 1978), *affd,* 623 F.2d 769 (2ⁿᵈ Cir. 1980), the government supplied the defense with 25,000 pages of documents. Arguing that such discovery amounting to "burying the defendant in paper," the defense asked the government to identify which documents it intended to use at trial. Without significant discussion, the court agreed and granted the application. 458 F.Supp. at 882.

Citing *Turkish,* the same request was granted in *United States v Poindexter,* 727 F.Supp. 1470 (D.D.C. 1989). In that case, the government also produced thousands of pages of documents during discovery. But the court noted that there was "no reason why the government could not be more specific as to which documents it currently intends to use, and there are many reasons, ground in fairness to the defendant, the protection of his rights and not least Rule 16(a)(1), why it should be." 727 F.Supp. at 1484. *Accord, United States v Weissman,* 1996 WL

751385 (S.D.N.Y. 1996) ("the government does not satisfy [its obligation under the rules] by producing masses of documents without designating which of them it will seek to introduce at trial").

The same approach was taken in *United States v Upton*, 856 F.Supp. 727 (E.D.N.Y. 1994), *aff'd*, 78 F.3d 65 (2nd Cir. 1996), where the government produced thousands of pages of document, but specified only a handful of documents it deemed to be evidence of fraud. There, the court stated:

> "In this case, it is uncontroverted that the government has produced thousands of pieces of paper and of those thousands of documents the Superseding Indictment puts the defendants on notice of only a handful of items which the government contends is fraudulent. If it were the case that these were the only documents the government intended to rely upon at trial, defendants' position would not merit much discussion; it is not the job of the government to neatly organize and separate the documents for the defendants. However, it is not clear that the government will restrict its proof to the documents cited in Paragraph 27(b) of the Superseding Indictment. In its memorandum in opposition, the government states that 'the defendants have known *for over seven months* the specific instances of records falsification the government will seek to prove at trial.' **** However, the government also says that it will, prior to trial, designate its trial exhibits. It could be, therefore, that the government plans on introducing allegedly falsified maintenance records other than those specified in the Superseding Indictment. If that is the case, the reasoning of *Turkish, Poindexter,* and *Bortnovsky,* and the language and policy concerns of Rule 16 require that the government provide defendants with adequate notice of the allegedly falsified documents upon which it plans to rely at trial in ordere to allow them to adequately prepare their defense. This analysis applies with equal force to defendant's request that the government provide a list of all documents to be referred to or relied upon by government witnesses." (emphasis added) 856 F.Supp. at 748.

Also noteworthy for present purposes is *United States v Bortnovsky,* 820 F.2d 572 (2nd Cir. 1987), where the Second Circuit reversed on the ground that the district court should have provided a bill of particulars. The court wrote:

> "We conclude that <u>appellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information</u>: the dates of the fake burglaries and the identity of the three fraudulent documents. Appellants were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending. In effect, the burden of proof impermissibly was shifted to appellants. While we commend the Government for cooperating in the turning over of documents prior to trial, we do not look with favor on the manner in which the Government conducted the prosecution. The relevance of key events was shrouded in mystery at the commencement of and throughout the trial. <u>The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged</u>. Appellant Bortnovsky's counsel was particularly susceptible to being waylaid by such a tactic as he had only four days within which to prepare a defense. In sum, we find that the district court erred by failing to grant a bill of particulars which was vital to appellants' understanding of the charges pending and to the preparation of a defense and which would have prevented the Government in its attempt to proceed furtively." 820 F.2d at 57 (emphasis added).

More recently, in *United States v Nachamie*, 91 F.Supp.2d 565 (S.D.N.Y. 2000), the court disagreed that any of the foregoing decisions amounted to persuasive precedent that the Federal Rules of Criminal Procedure required the government to identify those documents which it intended to rely during its case-in-chief; nevertheless, the court concluded that the government was obligated to provide more specifics as to the basis for its allegations of Medicare fraud. In that case, the government produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims. Relying on *Bortnovsky*, the court determined the government

had not met its obligation of providing adequate notice to the defense. More details were needed to enable the defense to prepare for trial, prevent surprise and interpose a plea of double jeopardy. 91 F.Supp. at 571-72.

Thus, the court ruled that, "[b]ecause the government has declined to identify which of the documents provided to the defense *** it intends to use in its case-in-chief at trial, it must, instead, respond to an appropriate bill of particulars." 91 F.Supp. at 572; *see also, United States v Bin Laden,* 92 F.Supp.2d 225, 234 (S.D.N.Y. 2000) ("sometimes the large volume of material disclosed is precisely what necessitates a bill of particulars"); *United States v Lino,* 2001 WL 8356 (S.D.N.Y. 2000); *United Stats v Modi,* 197 F.Supp.2d 525, 530 (W.D. Va. 2002) (recognizing that "the volume of discovery in a complex case may itself impede rather than assist the defense in its understanding of the government's case"); *United States v Hsia,* 2000 WL 195067 (D.D.C. 2000) (requiring the defendant to identify which of the thousands of documents produced she intends to rely upon at trial); *United States v Washington,* 819 F.Supp. 358 (D. Vt. 1993) (should the defendants demonstrate that they are overwhelmed by a volume of material, the court would consider requiring the government to particularize the evidence it intends to use at trial); *accord, United States v McDade,* 1992 WL 382351 (D.E. Pa. 1992).

Though these cases take different approaches and impose different remedies, each of them recognize that, where the volume of documentation is so great that it overwhelms the resources of the defense to review and organize the materials, the disclosure of the uncategorized documents may, in effect, be the equivalent of complete non-disclosure. Thus, these cases, considered together, stand for the proposition that the government cannot evade the rules governing discovery by "burying the defense in paper"; where the volume of materials is staggering, the government

must make reasonable efforts to organize the materials in a comprehensible format. Moreover, these decisions vindicate the defendant's rights under the Due Process Clause and Sixth Amendment, by ensuring that they are provided with usable discovery in sufficient time to prepare for trial and present a defense.

The current case raises the same concerns. Here, the government has provided thousands of pages of line sheets, each of which ostensibly summarizes numerous distinct conversations. Yet, this documentation borders on being useless. The line sheets are not organized in any manner aside from date and telephone number. But the problem goes far beyond merely an absence of organization; for the summaries of the conversations are so incomplete and truncated that it is frequently impossible to ascertain their general topic, let alone the actual substance and details of the communications.

Space and time naturally precludes a detailed explanation of all the line sheets in this application. But several line sheets – chosen here randomly – are illustrative (annexed hereto collectively as Exhibit "C"). For example, a line sheet dated October 28, 2000 reports that there were 24 intercepted calls, two of which were incriminating. During one call, "Chris" reportedly tells "Peter" "about something Peter did that doesn't work. Car. NP. MTO [sic]." The next reported intercepted conversation is summarized as follows: "Car talk: About internet and spoder. NP MTO [sic]." After that, the line sheet indicates "door handle – car. MTO." A few lines further down the page, the line sheet contains the notation, "'Dominic' for Ray. (waiting). Talking about 'water machine guns.' While waiting. Ray out. Call back."

Needless to say, such descriptions are not genuinely informative. The reader has no real idea what was discussed during these conversations. No explanation is provided for the

abbreviations.   While one might guess that the government did not consider any of these conversations to be incriminating, one cannot be certain because the allegedly incriminating conversations are also not identified.  And even if the aforementioned conversations are not, in fact, incriminating, the reader has no way of knowing whether the government considered them to be affirmatively *exculpatory.*

Another example is the line sheet report dated October 25, 2000, which indicates that 49 calls were intercepted, and two were incriminating.  Again, the allegedly incriminating calls were not specifically identified.  Perhaps the investigators placed significance on one call, summarized as follows: "M/o (Chris) (Phil).  P - He showed me a piece and he said Friday he'd have it.  C - it's been a year.  I'll come and see you tomorrow.  I'll call you later."   Or perhaps the investigators were concerned about the following call, mentioned a few pages later:  "I left them down.  He got convicted him on everything.  25 to life.  You go to board in 18 ½ years.  NP. Mto."  But because the line sheets provide no suggestion as to which calls have been singled out as incriminating, the defense cannot ascertain whether those particular calls have any importance whatsoever, either to the prosecution or the defense.

Countless other examples could easily have been included, space and time permitting.  *See also* Exhibits A and B.  But suffice it to say for present purposes that virtually all of the line sheets are similarly cryptic.  Many are replete with unexplained abbreviations, relying on short-hand terminology (if not codes), comprehensible only to the person who made the notations or to someone with someone with intimate knowledge about the author's conventions. Typically, the notations do not indicate whether they are quoting the source or merely paraphrasing.  Nor do the summaries clearly reveal the length of the communications.  And not only do the line sheets

neglect to identify which conversations are allegedly incriminating, they make no effort to inform the reader whether any of the communications could arguably be considered exculpatory, or otherwise useful to the defense.

These omissions and deficiencies have seriously impaired the ability of the defense to prepare thorough pretrial motions. Without more detail about the substance of the intercepted communications, it is difficult for the defense to present complete arguments as to whether the government has complied with the various requirements of Title III. Absent complete knowledge of the communications, the defense is limited in asserting, for example, that: the progress reports or continued applications were misleading or incomplete, requiring a *Franks* hearing; the investigators did not fulfill the requirement of "minimization"; the government neglected to move promptly to amend the eavesdropping warrants once additional crimes, not contemplated by the initial eavesdropping application, were intercepted; or even that the government failed to satisfy the requirements concerning sealing and notice. And without knowledge as to which tapes the government intends to introduce into evidence, the defense cannot argue that any particular tapes should be suppressed on the ground that they are too inaudible to be probative.

Of course, the missing detail and information about the intercepted communications also raises a substantial barrier to trial preparation. As in *United States v Upton, supra, United States v Weissman, supra, United States v Bortnovsky, supra, United States v Poindexter, supra, United States v Turkish, supra, United States v McDade, supra*, and *United States v Nachamie, supra*, the mass of undifferentiated documentation makes it tremendously burdensome for the defense to predict the nature of the evidence the prosecution is likely to rely upon. And without that understanding, the defense is crippled in developing theories of the case, or even bases for cross-

examination.  Indeed, the cryptic nature of the line sheets here makes the need for specificity much more compelling in this case.

Moreover, there is no apparent reason why the government should not provide much more detail.  As one court stated a "narrow view" of the discovery rules "is inappropriate," as "failure to provide reasonably available material that might be helpful to the defense and which does not pose any risks to witnesses or to ongoing investigation is contrary to requirements of due process and to the purposes of the Confrontation Clause." *United States v Zanfordino,* 833 F.Supp. 429, 432 (S.D.N.Y. 1993).

For all the foregoing reasons, the government should be directed to transcribe all of the intercepted communications verbatim, identity those which it intends to offer into evidence, indicate which communications it deems to be either inculpatory or exculpatory, and specify which conversations Defendant either participated in directly or was the subject of discussions by others.[5]

---

[5]    Alternatively, this Court may direct the government to provide much of the same information by way of a bill of particulars.  Should the Court prefer that remedy, we will prepare a formal request for a bill of particulars at the Court's convenience.

## POINT IV

**PURSUANT TO THE FEDERAL RULES, THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE, THIRTY DAYS IN ADVANCE OF TRIAL: (1) ALL EXHIBITS EXPECTED TO BE OFFERED DURING ITS DIRECT CASE; (2) A LIST OF ANTICIPATED WITNESSES; (3) A LIST OF ALL UNINDICTED COCONSPIRATORS; (4) A SUMMARY OF EXPERT TESTIMONY; AND (5) NOTICE OF ANY UNCHARGED CRIMES AND PRIOR BAD ACT EVIDENCE IT MAY SEEK TO OFFER INTO EVIDENCE**

As discussed in Point III of this memorandum, the volume of documentation and audio tapes provided to the defense has created a significant burden in preparing for trial, warranting more specificity especially with regard to the electronic surveillance evidence. For similar reasons, we ask the Court to exercise its discretion by directing the government to provide various discovery thirty days in advance of trial, pursuant to the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.

Subdivision (a)(1)(c) of Fed. R. Crim. P. 16 provides that:

> "<u>upon request</u> of the defendant, <u>the government shall</u> permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody, or control of the government and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant" (emphasis added).

*See generally, United States v Armstrong,* 517 U.S. 456, 462-63 (1996); *United States v Maniktala,* 934 F.2d 25, 28 (2nd Cir. 1981). While the government ordinarily may comply with

this obligation just by providing the defense with access to a collection of documents, more specificity may be required where the volume of documents is considerable. *See, United States v Marino,* 639 F.2d 882, 889 (2nd Cir. 1981).

In addition, subdivision (a)(1)(D) of Rule 16 requires the government to permit the defendant to inspect, upon request, reports or results of physical and mental examinations and scientific tests, and subdivision (a)(1)(E) of that rule requires the government to produce, upon request, a summary of expert witness testimony. *See, United States v Dukagjini,* 326 F.3d 45, 56 (2nd Cir. 2003). Significantly, nowhere in Rule 16 is there any language permitting the government to delay responding to such requests for discovery and inspection until some self-imposed deadline.

Similarly, other rules require the government to give notice of its intent to introduce certain evidence in sufficient time in advance of trial or hearing to allow the defendant to raise objections. *See e.g,* Fed. R. Crim P. 807 [regarding residual exception to hearsay rule]; Fed. R. Crim P. 609 [regarding impeachment evidence of convictions]; *see also,* Fed. R. Crim P. 12(d). Most notably, Fed. R. Evid. 404(b) declares that, "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial *** of the general nature of any such evidence [of other crimes, wrongs or acts] it intends to introduce at trial."

The underlying policy of these rules is "to reduce surprise and promote early resolution on the issue of admissibility." *United States v Perez-Tosta,* 36 F.3d 1552, 1561 (11th Cir. 1994); *see also, United States v Cruz,* 363 F.2d 187, 196 n.2 (2 nd Cir. 2004) (regarding expert testimony); *United States v Garcia* , 291 F.3d 127, 136 (2 nd Cir. 2002) (regarding 404(b) evidence). Whether notice is reasonable depends upon a number of factors, such as the

-42-

circumstances in which the prosecution discovered the evidence, the motivations of the prosecution, the significance of the evidence and the prejudice suffered by the defendant due to the notice not occurring sooner. *See generally, United States v Euceda-Hernandez,* 768 F.2d 1307, 1313 (11th Cir. 1985); *United States v Doe,* 860 F.2d 488 (1st Cir. 1988).

Apart from these particular rules, courts have repeatedly recognized that trial judges have inherent authority to control the nature and timing of discovery in general. *See generally, United States v Cannone,* 528 F.2d 296, 298 (2nd Cir. 1975). As one court stated, "[t]his authority emanates from the district court's 'inherent power, exercisable under appropriate circumstances, to assure the proper and orderly administration of criminal justice.'" *United States v Colon,* 1998 U.S. Dist. Lexis 6200, *14 (N.D. Ill. 1998), quoting *United States v Jackson,* 508 F.2d 1001, 10007 (7th Cir. 1975); *see also,* Fed. R. Crim. P. 16(d)(1) (granting the court authority to regulate discovery generally through protective or modifying orders). Indeed, district courts have broad authority not only to order early disclosure of various items, but also to impose a wide range of sanctions for failure to comply. *See generally,* Fed. R. Crim. P. 16(d)(2); *United States v Jackson,* 51 F.3d 646, 651 (7th Cir. 1995); *United States v McCrory*, 930 F.2d 63, 69-70 (D.C. Cir. 1991); *United States v Beverly*, 913 F.2d 337, 355 (7th Cir. 1990); *United States v Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988).

In this case, the need for early discovery is manifest. As already discussed, the government has disclosed hundreds of pages of line sheets, along with thousands of hours of tape recordings. None of the conversations have been transcribed or indexed in any meaningful way. And because a significant percentage of the line sheets are literally indecipherable, the defense has no way of ascertaining which intercepted communications the government considers significant.

-43-

As a result, the defense understanding of the prosecution is largely based upon nothing more than the language of the indictment.

Yet, the indictment is relatively complex, and raises more questions than it answers. The indictment accuses 19 defendants of a total of 27 counts, described over 54 pages. As this Court has observed, the 27 counts are arranged into five distinct groups: (1) racketeering charges; (2) gambling charges; (3) loansharking charges; (4) the "EDP extortion and related fraud charges; and (5) the "Doubleclick charges." *See,* Order dated November 22, 2005. The racketeering conspiracy allegedly spans a period of eight years. While the indictment includes a fair amount of nonessential background information about the history of organized crime, scant details are offered about how these various conspiracies allegedly operated. Certainly, the indictment does not reveal the precise role each defendant allegedly played in each conspiracy, the number or identity of unindicted co-conspirators or the assortment of uncharged bad acts which the government, inevitably, will offer into evidence.

Accordingly, we ask the Court to direct the government to provide discovery of various items thirty days in advance of trial, as have other courts in similar situation. Specifically, we ask for: (1) a list of anticipated witnesses, *see, United States v Giffen,* 379 F.Supp.2d at 345, *supra* (directing that the list be provided ten days before trial); *accord, United States v Lino,* 2001 WL 8356, *20 (S.D.N.Y. 2001) (granting request for witness list, notwithstanding that no specialized need had been demonstrated); *cf., United States v Bejasa,* 904 F.2d 137, 191 (2nd Cir. 1990); (2) a list of anticipated exhibits, and copies of those exhibits, *see, United States v Giffen,* 379 F.Supp.2d 337, 344 (S.D.N.Y. 2004) (directing that notice be provided 30 days before trial), *see also, See e.g, United States v Upton,* 856 F.Supp. at 748, *supra; United States v Turkish,* 458

-44-

F.Supp. at 882, *supra*; (3) names of unindicted co-conspirators, *see, United States v Nachamie,* 91 F.Supp.2d at 572, *supra*; *United States v Lino,* 2001 WL 8356, *12 (S.D.N.Y. 2001); *United States v Feola,* 651 F.Supp. at 1132, *supra*; and (4) a summary of any anticipated expert testimony, including that which ostensibly relates to "reputation.". *See,* 18 U.S.C. §§ 892, 892.

In particular, we ask the Court to direct the prompt disclosure of any prior bad acts or uncharged crimes the government intends to offer. As noted earlier, Fed. R. Evid. 404(b) now explicitly preconditions the admission of prior uncharged crimes or bad acts upon "reasonable notice" to the defense. The rule states that, "<u>upon request</u> by the accused, <u>the prosecution</u> in a criminal case <u>shall provide reasonable notice in advance of trial</u>, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." (emphasis added). Thus, the government has the burden of establishing "good cause" in order to delay notice until trial. Depending on the circumstances, courts have held that "reasonable notice" amounts to two weeks before trial, *See e.g., United States v Evangelista,* 813 F.Supp. 294, 302 (D.N.J. 1993); *United States v Williams,* 792 F.Supp. 1120, 1133 (S.D. Ind. 1992), 45 days before trial. *See, United States v Giffen,* 379 F.Supp.2d at 345, *supra,* or even 60 days before trial. *See, United States v Lino,* 2001 WL 8356, *20, *supra.*

Considering the complexity of this case, we believe it is reasonable to ask that the Court to direct the government to provide such notice thirty days before trial. Under ordinary circumstances, the admissibility of 404(b) evidence tends to be one of the most contentious trial issues, as it involves several difficult analytical inquiries. Basically, in order to admit uncharged crimes or "bad act" evidence, courts must: (1) determine that the evidence is "offered for a proper purpose"; (2) determine that the evidence is "relevant"; (3) determine that its probative value

outweighs its prejudicial effect under Rule 403; and (4) upon request, the court must charge the jury to consider the evidence only for its limited purpose. *Huddleston v United States*, 485 U.S. 681, 691-92 (1988)*; see also, United States v Ortiz*, 857 F.2d 900, 903 (2nd Cir. 1988). While taking an "inclusionary approach" to 404(b) evidence (*see, United States v Roldan-Zapata*, 916 F.2d 795, 804 (2nd Cir. 1990), the Second Circuit has nonetheless repeatedly warned district courts that, in determining the admissibility of prior bad acts, "caution and judgment are called for." *United States v Mohel*, 604 F.2d 748, 751 (2nd Cir. 1979); *United States v O'Connor*, 580 F.2d 38, 43 (2nd Cir. 1970); *see also, United States v Colon*, 880 F.2d 650, 656 (2nd Cir. 1989).

Here, there is reason to expect that the court will be forced to devote considerable time to resolving the admissibility of such evidence. For the breadth of the indictment – in terms of the number of crimes alleged, the number of defendants charged and the duration of the conspiracy – suggests that the government will seek to introduce a plethora of evidence of uncharged crimes and prior and bad acts. Indeed, such tactics seem especially prevalent in prosecutions involving allegations of organized crime. By requiring the government to provide notice of 404(b) evidence one month before trial, therefore, the Court will enable the parties to litigate the admissibility of such evidence fully, as well as allow itself ample time to reach thoughtful decisions.

Accordingly, for all the foregoing reasons, we ask the Court to direct the disclosure of the aforementioned evidence no later than thirty days before trial.

## POINT V

**PURSUANT TO *BRADY* AND ITS PROGENY, THE COURT SHOULD DIRECT THE GOVERNMENT TO DISCLOSE, AS SOON AS IT BECOMES AVAILABLE, ANY MATERIAL THAT IS EITHER EXCULPATORY, USEFUL FOR PURPOSES OF CROSS-EXAMINATION, OR HELPFUL IN DISCOVERING OTHER MATERIAL INFORMATION**

As alluded to earlier, there is no question that the Due Process Clause obligates the government to disclose "material evidence." In *Brady v Maryland,* 373 U.S. at 87, *supra*, the Supreme Court declared that:

> "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also, United States v Gill,* 297 F.3d 93, 101 (2nd Cir. 2002).

Since then, the Supreme Court has added that the government has a general duty to disclose information with obviously exculpatory value, even when no request has been made. *United States v Agurs,* 427 U.S. at 103, *supra.* The government's duty of disclosure is also codified in Rule 16 of the Federal Rules of Criminal Procedure, which provides that the government, upon request, must provide, *inter alia*, documents or tangible objects if: (1) they are material to the preparation of the defense; (2) the government intends to offer them as evidence in its case in chief; or (3) they were obtained from or belong to the defendant.

Often, the key question in evaluating *Brady* claims is whether the items sought are "material." Simply put, evidence is "favorable" if it tends to show that the accused is not guilty

or if it impeaches a government witness. *See, Shabazz v Artuz,* 336 F.3d 154, 161-62 (2nd Cir. 2003); *United States v Gill,* 297 F.3d 93, 101 (2nd Cir. 2002). Thus, there is no distinction, for purposes of *Brady* analysis, "between impeachment evidence and exculpatory evidence." *United States v Bagley,* 473 U.S. 667, 676 (1985); *see also, Giglio v United States,* 405 U.S. 150, 151 (1972); *United States v Wong,* 78 F.3d 73 (2nd Cir. 1996).

Further, though "one consideration that bears on *Brady* materiality is admissibility," it is sufficient that the item in question is either partly admissible, could lead to admissible evidence or "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." *United States v Gill,* 297 F.3d at 104, *supra*. In the context of appellate review, the Second Circuit has observed that:

> "'In order for evidence to be "material" within the meaning of *Brady*, a defendant does not need to show that the evidence, if disclosed, would have resulted in his acquittal; rather, he needs to show only that the evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"" (emphasis added). *Shabazz v Artuz,* 336 F.3d at 161-62, *supra,* quoting *United States v Schwarz,* 259 F.3d 59, 64 (2nd Cir. 2001), in turn quoting, *Kyles v Whitley,* 514 U.S. 419, 433 (1995); *accord, Wood v Bartholomew,* 516 U.S. 1, 6 (1995); *Mendez v Artuz,* 303 F.3d 411, 412 (2nd Cir. 2002).

Harmless error analysis is superfluous once it is determined that material evidence has been withheld. *See, United States v Ellis,* 121 F.3d 908, 916 (4th Cir. 1997).

Importantly, "the mandate of *Brady* extends beyond any particular prosecutor's actual knowledge." *People v Wright,* 86 N.Y.2d 591, 598 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v Whitley,* 115 S.Ct. at 1567, *supra; accord, Titsworth v*

*Dretke*, 401 F.3d at 306, *supra*); *see also, United States v Payne*, 63 F.3d at 1208, *supra*. Though there is no general duty to disclose *Brady* material before trial, *see, United States ex rel. Lucas v Regan*, 503 F.2d 1, 3, n.1 (2nd Cir. 1974), the Second Circuit has made clear that "*Brady material must be disclosed in time for its effective use at trial*." *In Re United States v (Coppa)*, 267 F.3d 132, 142 (2nd Cir. 2001) (emphasis added); *United States v Gordon,* 844 F.2d at 1403, *supra*; *United States v Shoher,* 555 F.Supp. 346, 352 (S.D.N.Y. 1983). Indeed, the failure to disclose *Brady* material in sufficient time to enable the defense to investigate the information will result in reversal. *See, Grant v Alldredge,* 498 F.2d 376, 382 and n.7 (2nd Cir. 1974); *see also, United States v Gil,* 297 F.3d 93, 106-07 (2nd Cir. 2002). To permit the prosecution to decide when *Brady* material should be disclosed would be "to permit the prosecution to control, to some extent, the preparation of a defense." *United States v Crozzoli*, 698 F.Supp. 430, 436-37 (E.D.N.Y. 1988).

These principles make it incumbent upon the Court to direct the government, explicitly, to disclose any *Brady* material in its possession as soon as it becomes available. While prosecutors inevitably protest that they are aware of their obligations under *Brady*, such pronouncements do not obviate the need for an express order from the Court; for notwithstanding a general understanding by prosecutors of the prevailing law, the fact is that *Brady* violations, unfortunately, still persist. Moreover, we ask the Court to direct the government to provide certain specific items that generally fall within the ambit of *Brady* material, including: any plea agreements, cooperation agreements, proffer agreements or similar arrangements that might arguably impact the interest, motive or bias of a prosecution witness; statements of prosecution witnesses that reveal any exculpatory information, as well as any inconsistencies with prior

statements of those or any other witnesses, *see, United States v Starusko,* 729 F.2d 256, 260 (3rd Cir. 1984) (noting that pretrial disclosure may be required of Jenks Act materials, where they also qualify as *Brady* materials); *accord, United States v Gleason,* 265 F.Supp. 880, 887 (S.D.N.Y. 1967); and background information about the informants impacting their credibility, such as their criminal records and history of bad acts, *see, Roviaro v United States,* 350 U.S. 53 (1957).

Finally, we also note that there is one particular reason why it is important in this case to ensure that all conceivable *Brady* material is promptly disclosed: as already explained, the line sheets provided to the defense are substantially incoherent and unintelligible, making it especially difficult to fashion specific discovery requests. Accordingly, the Court should be particularly vigilant in exercising its oversight of the discovery process to ensure that the investigative machinery is available to both sides. *See generally, United States v Kattar,* 840 F.2d 118, 127 (1st Cir. 1988) (noting that full disclosure benefits the prosecution and the public, as well as the defense, and observing that a criminal trial should be viewed as a "quest for truth," rather than "an adversarial sporting contest").

## POINT VI

## PURSUANT TO FED. R. CRIM. P. 7(d), THE COURT SHOULD STRIKE THE SURPLUSAGE IN THE INDICTMENT

Fed. R. Crim. P 7(c) provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Subsection (d) of that statute adds that the court, on motion of the defendant, may strike surplusage from the indictment. In this case, the indictment is replete with inflammatory language concerning organized crime. Though this information ostensibly is included on the ground that it is relevant background, it is actually unnecessary and quite inflammatory. Accordingly, this Court should strike such language as mere surplusage.

The standards for granting motions to strike surplusage are relatively straightforward. Language is not surplusage if it represents information the government has a legitimate reason to attempt to prove at trial. *See, United States v Chas. Pfizer & Co.*, 217 F.Supp. 199 (S.D.N.Y. 1963), *rev'd on other grounds*, 426 F.2d 32 (2nd Cir. 1970); *see also, United States v Rastelli*, 653 F.Supp. 1034, 1055 (E.D.N.Y. 1986). So long as the information is relevant and admissible, it will not be stricken, even if prejudicial. *See, United States v Scarpa*, 913 F.2d 993, 1013 (2nd Cir. 1990).

On the other hand, "[t]he inclusion of clearly unnecessary language in an indictment that could only serve to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved surely can be prejudicial." *United States v Climatemp, Inc.*, 482 F.Supp. 376, 391 (D.C. Ill. 1979); *see also, United States v Bullock*, 451

F.2d 884, 888 (5th Cir. 1971); *United States v Bufalino,* 285 F.2d 408 (2nd Cir. 1960). Thus, motions to strike surplusage should be granted "where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory or prejudicial matter." *United States v Alsugair,* 256 F.Supp.2d 306, 317 (D. NJ 2003); *see also, United States v Gambino,* 818 F.Supp.541 (E.D.N.Y. 1993); C. Wright, *Federal Practice and Procedure.* § 127, at 277 (1969). Typically, the "determinative question" is not the potential prejudice, but the relevance of the language in question. *See, United States v Napolitano,* 525 F.Supp. 465, 480 (S.D.N.Y. 1982).

Though these motions are rarely granted, *see, United States v Guerrerio,* 670 F.Supp. 1215, 1225 (S.D.N.Y. 1987), we submit that such relief is warranted here. The first paragraph of the indictment alleges that the defendants were "members of the Colombo Brothers Crew, an off-shoot of the Colombo Organized Crime Family of La Cosa Nostra." Thereafter, the indictment adds that the "Colombo Brothers Crew was a spin-off of the Colombo Organized Crime Family of LCN." Indictment, ¶ 3. Presumably, such information is included in order to establish how the so-called "Colombo Brothers Crew" arose.

But the subsequent language is plainly unjustified under any interpretation. Paragraph three proceeds to discuss how five organized crime families – each of which are needlessly identified – operated in the New York and New Jersey areas. Indictment, ¶ 3. The following paragraph then sets forth how the "Colombo Organized Crime Family" allegedly operated, i.e.: each crew had a leader ("capo" or "captain"); each crew consisted of "wiseguys," "soldiers" or "made members"; and each crew had "associates" who were "connected" or identified as "with" a soldier." Indictment, ¶ 4. Paragraph 5 notes that each "capo" had supervisory responsibilities and received a share of the profit. Indictment, ¶ 5. Paragraphs six and seven outline the roles

of the "boss," the "underboss," and the "consigliere" within each alleged organized crime family. Indictment ¶¶ 6-7.   And paragraph 7 observes that the "Colombo Organized Crime Family took its name from" Joseph Colombo, the father of Defendant and Anthony Colombo.  Indictment, ¶ 8.

Perhaps all of this information would be properly included if the theory of the indictment were that the various conspiracies were undertaken under the auspices of the "Colombo Organized Crime Family."  But paragraph nine makes clear that the defendant's connection to the "Colombo Organized Crime Family" is actually irrelevant.  That paragraph states as follows:

> "Several years after the death of Joseph Colombo, in the early 1990s, two factions of the Colombo Organized Crime Family began to vie for outright control over the affairs of the Family.  One faction was led by Alphonse Persico, the son of the Colombo Organized Crime Family's longtime boss, Carmine Persico, who was then, and still is, serving a federal sentence of life imprisonment; the other faction was led by Victor Orena, a high ranking member of the Colombo Organized Crime Family.  At the conclusion of the bloody internecine war, numerous members and associates on both sides lay dead, and the Persico faction emerged victorious.  Anthony Colombo, Christopher Colombo, and Gerard Clemenza, were in the losing Orena faction.  In the aftermath of the Colombo Family war, Anthony Colombo and Gerard Clemenza were put on the 'shelf' by the Colombo Organized Crime Family and, as a result, were no longer involved in the day-to-day operations of the Colombo Organized Crime Family.  Under the rules of LCN, however, both Anthony Colombo and Gerard Clemenza remained soldiers in the Colombo Organized Crime Family."  Indictment, ¶ 9.

Thus, <u>the express theory of the indictment is that Defendant and the others committed the crimes,</u> <u>without the "day-to-day" involvement of the "Colombo Organized Crime Family."</u>

Yet, if the charged enterprise acted independently of the "Colombo Organized Crime Family," there simply is no reason to include all those references to that alleged organization. Indeed, it is difficult to fathom why the government would need to establish that the "Colombo Organized Crime Family" endured a "bloody internecine war," leading to the deaths of many members and associates. Unlike so many racketeering cases, therefore, the historical references to the "Colombo Organized Crime Family" are entirely irrelevant. *Compare, United States v Napolitano,* 525 F.Supp. at 480, *supra* (references to the "Bonanno Family of La Cosa Nostra" were relevant insofar as they identified the enterprise and described the means by which its members and associates conducted various criminal activities"). Moreover, those historical references are blatantly inflammatory, as they suggest that the defendants are involved in much larger, more violent schemes. *Compare, United States v Alsugair,* 256 F.Supp.2d at 317, *supra* (granting the motion to strike surplusage where the multiple references to "others" implied that there were additional individuals involved in the scheme, "which could prejudice the defendant by leading the jury to believe that there exists a broader scope of illegal activity than is actually charged in the indictment"). Indeed, it bears repeating that there simply is no truth to any suggestion that Defendant held a formal role within the Colombo Organized Crime Family, let alone any involvement in the so-called "bloody internecine war.".

In brief, the historical references to the Colombo Organized Crime Family should be stricken as surplusage because they are irrelevant, inflammatory and potentially confusing to the jury. *Compare, United States v B. Goedde & Co.,* 40 F.Supp. 523, (E.D. Ill. 1941) (doubting that the defendants could receive a fair trial where the indictment recited facts which "smack[ed]

-54-

so much of a colorful, inflammatory, argumentative discourse"); *see also, United States v LeMay*, 330 F.Supp.. 628, 630 (D. Mont. 1971).


### POINT VII

**THE COURT SHOULD RULE, *IN LIMINE,* THAT THE STATEMENTS CONTAINED IN THE EAVESDROPPING APPLICATIONS, LINE SHEETS AND PROGRESS REPORTS ARE ADMISSIBLE AGAINST THE GOVERNMENT, IN THE EVENT THAT THEY CONFLICT WITH THE GOVERNMENT'S TRIAL ALLEGATIONS**


It is fundamental that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." *United States v Margiotta,* 662 F.2d 131, 142 (2nd Cir. 1981), *cert. denied*, 461 U.S. 913 (1983). Similarly, pleadings may be considered admissions of a party-opponent, admissible against a party in the original litigation as well as subsequent litigation. *See generally, Contractor Utility Sales Co. v Certain-Teed Products Corp.,* 638 F.2d 1061, 1084 (7th Cir. 1981); *Raulie v United States*, 400 F.2d 487, 526 (10th Cir. 1968). Accordingly, we submit that the statements contained in the various eavesdropping applications, line sheets and progress reports are potentially admissible against the government, in the event that they conflict with the government's position at trial. We ask the Court to consider this issue now, because of the likelihood that such a conflict will arise and to assist the parties in trial preparation.

Fed. R. Evid. 801(d) provides that a statement is not hearsay if it qualifies as an "admission by party-opponent," which it defines, in pertinent part, as either the party's own statement, or:

> "(B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent, or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ****

The concept of party-admissions in criminal cases was discussed most famously in *United States v McKeon*, 738 F.2d 26 (2nd Cir. 1994), where the Second Circuit condoned the judge's decision to admit portions of defense counsel's opening statement from a prior trial, which hand ended in a hung jury. Initially, the Second Circuit agreed that statements made by an attorney – including opening statements from a prior trial – may be admissible against the party retaining that attorney. 738 F.2d at 30, citing *United States v Margiotta,* 662 F.2d at 142, *supra.* The court declared that "prior opening statements are not *per se* inadmissible in criminal cases," for a contrary holding would "invite abuse and sharp practice [and] would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings." 738 F.2d at 31.

Still, the Second Circuit made clear that the admissibility of statements from defense attorneys should be strictly "circumscribed in order to avoid trenching upon other important policies." 738 F.2d at 32. Specifically, the court identified five policy concerns. "First, the free use of prior jury argument might consume substantial time to pursue marginal matters." *Id.* "This will result in a substantial loss of time on marginal issues, diversion from the real issues

-56-

and exposure to evidence which may be otherwise inadmissible and prejudicial." *Id.* The second factor was that "inferences drawn from an inconsistency in arguments to a jury may be unfair." In this regard, the court emphasized that the burden of proof remains on the government and "defense counsel may legitimately emphasize the weaker aspects of the government's case." *Id.*

A third factor cited by the court was that "the free use of prior jury argument may deter counsel from vigorous and legitimate advocacy." *Id.* Considering the importance of argument, the Second Circuit asserted that "[c]ounsel should not, except when the truth-seeking purpose clearly demands otherwise, be deterred from legitimate argument by apprehension about arguments made to a jury in an earlier trial." *Id.* (emphasis added). Fourth, the court noted that "where an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists, the offer of that explanation may seriously affect other rights of the defense," such as the attorney-client privilege. *Id.* Finally, the Second Circuit recognized that "the admissibility of a prior opening statement may lead to the disqualification of counsel chosen by the defendant, a most serious consequence." 738 F.2d at 333.

With these considerations in mind, the Second Circuit proclaimed the following rules:

> "Before permitting such use, <u>the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial</u>. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. The <u>inconsistency, moreover, should be clear</u> and of a quality which obviates any need for the trier of fact to explore other events at the prior trial. The court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf,

-57-

considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant." *Id.* (emphasis added).

Finally, the court added that:

"the district court should in a Fed. R. Evid. 104(a) hearing outside the presence of the jury, determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the prior opening statement should be excluded. We impose this requirement so as to allow leeway for advocacy and lessen the burden of choice between the defendant's not explaining the inconsistency to the jury or sacrificing other valuable rights. Moreover, where the attorney-client privilege, the privilege against self-incrimination, the fear of impeachment by a prior conviction, apprehension over having to change attorneys, the revelation of work product, trial tactics, or legal theories of defense counsel may be involved in explaining the changes in the defendant's version of events, the court should offer an opportunity to the defense to present those reasons *in camera*, outside the presence of the jury and the prosecution." 738 F.2d at 33. (emphasis added).

Many courts have reaffirmed the vitality of *McKeon,* usually in the context of defense attempts to introduce prior statements by prosecutors or other government agents. *See, United States v DeLoach,* 34 F.3d 1001, 1005 (11th Cir. 1994); *United States v Concepcion,* 983 F.2d 369, 393 (2nd Cir. 1993); *Parker v Singletary,* 974 F.2d 1562, 1578-79 (11th Cir. 1992); *United States v Harris,* 914 F.2d 927, 931 (7th Cir. 1990); *United States v Arrington,* 867 F.2d 122, 127-28 (2nd Cir. 1989); *United States v Valencia,* 826 F.2d 169, 173-74 (2nd Cir. 1987); *United States*

*v Wells,* 1994 WL 421471 (S.D. Calif. 1994). Indeed, some courts have concluded that there is even greater leeway for introducing prior statements by government agents.

For example, in *United States v Bakshinian,* 65 F.Supp.2d 1104 (C.D. Calif. 1999), the question was whether to admit a statement made by a prosecutor in the closing argument of a co-defendant's trial. At the outset, the court agreed that, under the Federal Rules, a prosecutor is the agent for the federal government, so that statements the prosecutor makes may be admissible against the government under the "party-opponent rule." 65 F.Supp.2d at 1106; *see also, United States v Salerno*, 937 F.2d 797, 811-12 (2nd Cir. 1991), *rvsd on other grounds,* 505 U.S. 317 (1992); *United States v Kattar,* 840 F.2d 118, 130 (1st Cir. 1988); *United States v Morgan,* 581 F.2d 933, 937, n.10 (D.C. Cir. 1978). But the court proceeded to find that the various protections discussed in *McKeon* need not apply where the statement in question is attributed to the government, rather than the defense.

First, the court observed that the defense "is entitled to greater leeway than the government because the defense need not prove anything." 65 F.Supp.2d at 1108. Further, the government is prohibited from taking inconsistent positions between trials. "Thus, the fact that the government's statements in a previous trial might be admitted in a later trial will not hinder proper advocacy by the government." *Id.* Additionally, when the question is whether to admit a prosecutor's statement, there are no concerns arising out of the Fifth Amendment, the right to counsel or attorney-client privilege. *Id.* For these reasons, the court declined to apply the *McKeon* factors and, instead, elected to "consider the admissibility of the government prosecutor's statement in a manner similar to any statement offered pursuant to Rule 801(d)(2)(D)." *Id; see also, United States v Amato,* 356 F.3d 216, 219-20 (2nd Cir. 2004) (it was unnecessary for the trial

court to apply the *McKeon* factors when considering whether to admit a pretrial letter from defendant's prior counsel).

Whatever the precise analysis, these cases unanimously hold that statements by prosecutors or government agents may be admitted as "party-admissions" where they conflict with the government's trial position. And courts have applied the same logic when considering specifically whether to admit statements made by case agents in pretrial affidavits.    *See, United States v Warren,* 42 F.3d 647, 655 (D.C. Cir. 1994) (court abused its discretion in barring an officer's statement in a criminal complaint. The statement was relevant and admissible under Rule 801, as non-hearsay statement offered against the government, in which the government had manifested or adopted a belief in its truth.); *see also, United States v Woo,* 917 F.2d 96, 98 (2nd Cir. 1990) (agreeing that the affidavit may be admissible under Fed. R. Evid. 801, but finding that the court had discretion to exclude it, since its probative value was outweighed by the danger of prejudice or confusion).

In this case, the defense anticipates that the government's trial position may conflict with numerous statements contained in the various eavesdropping applications, progress reports and line sheets. Throughout the progress reports and applications for extensions are statements that the officers had not yet found sufficient evidence of various crimes or been able to determine the full extent of the conspiracies, thereby necessitating the extensions. And the line sheets are replete with characterizations of intercepted communications as either "incriminating" or "non-incriminating." Plainly, there is a significant potential that some of these statements will be contradicted at trial.

While it would be premature at this point to identify which of these statements might conflict with the government's trial position, we nevertheless ask the Court to rule, *in limine,* that the statements in those documents amount to party-admissions and, consequently, are admissible pursuant to Fed. R. Evid. 801. Such a pretrial ruling will better enable the parties to prepare for trial. Indeed, a ruling on the admissibility of those statements could significantly affect how witnesses may or may not be cross-examined. Should the court rule that the statements in the various eavesdropping applications, progress reports and line sheets are admissible, then the parties can concentrate, at trial, on the subsidiary question of whether the statements otherwise should be admitted pursuant to Rule 401 and Rule 403.    *See, United States v Bakshinian,* 65 F.Supp.2d at 1110, *supra.*

### POINT VIII

**DEFENDANT REQUESTS PERMISSION TO JOIN IN THE MOTIONS SUBMITTED BY THE CO-DEFENDANTS TO THE EXTENT THAT THEY ARE RELEVANT AND APPLICABLE, AND FOR ANY OTHER RELIEF THAT THE <u>COURT MAY DEEM JUST AND PROPER</u>**

## CONCLUSION

## THE MOTION SHOULD BE GRANTED IN ALL RESPECTS

Dated:          December 30, 2005
                New York, NY

                                        Respectfully submitted,

                                        JEREMY SCHNEIDER, ESQ.
                                        Attorney for Defendant
                                            Christopher Colombo
                                        ROTHMAN, SCHNEIDER,
                                            SOLOWAY & STERN, LLP
                                        100 Lafayette Street, Suite 501
                                        New York, NY 10013
                                        (212) 571-5500

Of Counsel
James E. Neuman, Esq.

-62-