UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

          -v-                     :

CHRISTOPHER COLOMBO,              :          04 Cr. 273 (NRB)
JOSEPH FLACCAVENTO, and
FRANCIS ALTIERI,                  :

                                  :

          Defendants.             :

- - - - - - - - - - - - - - - - -x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' POST-TRIAL MOTIONS**


                         MICHAEL J. GARCIA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the United States
                           of America


Lisa A. Baroni
Jason P.W. Halperin
Assistant United States Attorney

     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

          -v-                     :

CHRISTOPHER COLOMBO,              :          04 Cr. 273 (NRB)
JOSEPH FLACCAVENTO,
FRANCIS ALTIERI,                 :

                                 :

          Defendants.            :

- - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

The Government respectfully submits this memorandum of law in opposition to the post-trial motions filed by defendants Christopher Colombo, Joseph Flaccavento and Francis Altieri. Defendant Joseph Flaccavento seeks a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on all the counts against him in the above-referenced indictment. Flaccavento argues that the Government failed to present sufficient evidence of his guilt, failed to establish the elements of the racketeering counts, and failed to prove the enterprise's effect on interstate commerce.

The defendant Francis Altieri argues that the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution prohibits a retrial of Altieri, and the Indictment must be dismissed at to him, because this Court erred in declaring a mistrial.

The defendant Christopher Colombo did not submit any post-trial motions but simply joined in the motions of his co-defendants.

The Government respectfully submits that the defendants' motion should be denied.

## BACKGROUND

### A. The Trial

Anthony Colombo, Christopher Colombo, Joseph Flaccavento, Nunzio Flaccavento and Francis Altieri were tried by a jury in the United States District Court, Southern District of New York. The trial lasted from January 3, 2007 until February 27, 2007. After the jury was impaneled, the parties made opening statements on January 16 and 17. The Government began presenting its case on January 18, and concluded on January 31 after 10 days of witness testimony and other evidence. The defense began its case the next day, February 1; the defense case lasted until February 6. The Government presented a rebuttal case on February 6. The parties gave summations to the jury from February 7 to February 9. After adjourning for the weekend, the court charged the jury on Tuesday, February 13, after which the jury began its deliberations.

On February 27, 2007, the tenth day of jury deliberations, the jury rendered a partial verdict. The jury convicted Christopher Colombo and John Berlingieri of Count Three (Gambling Conspiracy) and Count Four (Operation of an Illegal Gambling Business). The jury acquitted Christopher Colombo and John

Berlingieri of Count Nine (Collection of Extensions of Credit By Extortionate Means from Randy Margulies) and Count Ten (Collection of Extensions of Credit By Extortionate Means from Mark LNU). The jury acquitted John Berlingieri of Count One (RICO substantive). The jury acquitted Anthony Colombo of Count One (RICO Substantive), and Count Twelve (Extortion of EDP In Connection With the No Show Job of Carol Colombo), and acquitted Nunzio Flaccavento of Counts Five and Six, the two Counts in which he was charged.[*]

The jury could not reach verdicts on the remaining counts against the defendants: Count One (RICO substantive) as to Christopher Colombo and Joseph Flaccavento; Count Two (RICO conspiracy) as to all defendants charged; Count Five (Conspiracy to Make Extortionate Extensions of Credit) as to Christopher Colombo and Joseph Flaccavento; Count Six (Conspiracy to Collect Extensions of Credit by Extortionate Means) as to Christopher Colombo and Joseph Flaccavento; Count Seven (Making Extortionate Extensions of Credit to Sitterly and Kelly) as to Christopher Colombo and Joseph Flaccavento; Count Eight (Collecting Extensions of Credit by Extortionate Means from Sitterly and Kelly) as to Christopher Colombo and Joseph Flaccavento; Count Eleven (Conspiracy to Extort EDP) as to Anthony Colombo; Count Thirteen (Extortion of EDP in Connection with No-Show Job of Anthony Colombo); and all counts against Francis ALtieri, Count

---

[*] Throughout this brief, the Government refers to the Count numbers in the final version of the Indictment that the Court provided to the jury.

Fourteen (Conspiracy to Commit Mail Fraud and Commercial Bribery), Count Fifteen (Commercial Bribery) and Count Sixteen (Mail Fraud). The Court declared a mistrial with respect to those counts.[*]

## ARGUMENT

### I. Retrial Of Francis Altieri Is Not Barred By The Double Jeopardy Clause Of The Fifth Amendment

Altieri argues that the Double Jeopardy Clause of the Fifth Amendment bars his reprosecution because this Court's reasons for declaring a mistrial were insufficient and the declaration of a mistrial violated his Constitutional rights.

Altieri's motion is without merit. This Court declared a mistrial on the tenth day of jury deliberation after the jury had sent several notes indicating that they were deadlocked. This Court acted well within its discretion when it ruled that requiring the jury to deliberate further would not be productive and that a mistrial was in the interests of justice. In fact, all defense counsel, except for Altieri, agreed with the Court. Altieri's motion should be swiftly rejected.

### A. Relevant Facts

### 1. Jury Deliberations

---

[*]     As the Court is aware, Defendant Anthony Colombo has pled guilty in this case, and thus his Rule 29 motion is now moot. Moreover, as the Government informed the Court in a post-trial conference in April, the Government has decided to proceed to sentencing for Defendant John Berlingieri on the Counts on which he was convicted.

5

The jury began its deliberations on February 13, 2007, shortly after 2:00 p.m.  Tr. at 3830.  On the first day of deliberations, the jury elected a foreperson before being excused for the day at around 3:30 p.m.  Tr. at 3838-39.  The jury resumed deliberations the next day, February 14, at 9:00 a.m., Tr. at 3847, and spent the entire day deliberating.  Over the course of the day, the jury sent two notes to the court, requesting the transcripts of Dominic Fonti's testimony, and asking for clarification of the conspiracy charge.  Tr. at 3847-48.  February 15th was spent in largely the same fashion, with the jury beginning deliberations at 9:10 a.m. and sending several notes to the court over the course of the day.  Tr. at 3857.  The two notes of substance sent by the jury on the February 15 both requested transcripts of witness testimony.  Tr. at 3857, 3860. The jury deliberated for a full day on February 16 without sending any notes to the court.

After returning from the long weekend, the jury sent its first note indicating discord on February 20.  Following notes requesting transcripts of two witness' testimony and discussing juror schedules, Tr. at 3873, the jury sent a third note to the court that was entered into the record at 12:50 p.m., Tr. at 3874.  The note read:

> "Judge Buchwald: After following your
> instructions in response to our note you
> dated February 14, 2007, we have reread the
> paragraphs you noted and we are still unable
> to come to any agreement on most of these
> charges.  More specifically, can someone be a
> part of a conspiracy without their knowledge?
> And, if no evidence was shown to support it,

6

> are we supposed to just use our own judgment?
> Some jurors feel this way. Please guide us
> with some advice. Sincerely, jurors."

Tr. at 3874; Court Exhibit 8. The parties discussed this note at length with the court, specifically whether the jurors were unclear about what inferences could be drawn from circumstantial evidence and whether the jurors should be instructed on inferences. Tr. at 3888. Ultimately the court responded narrowly to the jury's questions, stating:

> "Members of the jury, you have asked
> whether someone can 'be a part of a
> conspiracy without their knowledge.' The
> answer is no. You have also asked whether if
> there is no evidence may a juror use their
> own judgment. The answer is no. The jury
> may not substitute speculation for evidence.
> If you have further questions, please let us
> know."

Tr. at 3898-99; Court Exhibit 9. After receiving this response from the court, the jury deliberated for the remainder of the day without sending any further notes.

The next day, February 21, the court received a second note from the jury indicating its inability to reach a verdict. That note, Court Exhibit 11, was entered into the record at 11:35 a.m., and read, "Judge Buchwald, we have been unable to reach a majority decision on some of the counts. We need to know how to proceed." Tr. at 3905. In discussing this note with counsel, Judge Buchwald indicated that she intended to instruct the jury to continue deliberations despite their differing opinions, without giving the jury an *Allen* charge. Tr. at 3911. After

considering but deciding against instructing the jury on their ability to deliver a partial verdict, Tr. at 3906-08, 3911-16, the judge sent a reply note which read, "Please remember that all of your findings on the jury verdict form as to guilty or not guilty, or proved or not proved, must be unanimous, which I am sure you understand means that all jurors are in agreement. I direct you to continue your deliberations. I advise you that it is normal for jurors to have differences. This is quite common." Tr. at 3914-15. The jury deliberated for the remainder of the day without communicating with the court.

The jury spent the entirety of February 22, their sixth full day of deliberations without sending any notes to the court. The court proposed, and ultimately decided against, sending an unsolicited communication to the jury on February 22. Tr. at 3922.

Jury deliberations entered their seventh day on the morning of February 23. With the jury continuing to deliberate, counsel and the court discussed two notes relating to juror scheduling conflicts. Tr. at 3932-33. The court also received a note, entered into the record as Court Exhibit 16, which reads:

> "Judge Buchwald, if a particular act has two
> parts, and one is proved and one is not, is
> the entire act then proven or not proven?
> Thank you, jury."

Tr. at 3942. The judge responded to this note by addressing the jury in open court. Tr. at 3951-52. The jury resumed its deliberations through the end of the court day without sending

any further notes.

The jury sent a third note indicating their inability to reach a unanimous verdict at 3:10 p.m. on February 26, Tr. at 3961, their eighth full day of deliberations. The jury's note, entered into the record as Court Exhibit 21, read:

> "Judge Buchwald, you stated if we had any further questions we should address it [sic] to you. Afer going over all recordings and evidence and 'deliberating,' for all of these days, we are still unable to reach a unanimous decision on some counts and none of us feel there is any hope of changing our minds since they are made up. So, here is the silly question: What do we do now? Respectfully, The jury."

Tr. at 3961. At this point, the government requested that the court give the jury both a partial verdict instruction and an *Allen* charge. Tr. at 3962. The court ultimately opted to instruct the jury solely on delivering a partial verdict. The instruction, which Judge Buchwald read twice to the jury, was:

> "Ladies and gentlemen, your last note to me suggested that you have reached a unanimous decision as to some but not all of the counts in the indictment. If that is in fact the case, it is up to you to decide whether to return any of those decisions. You may return a partial verdict at any time you choose by advising me in a note that you wish to do so.
> "A partial verdict means a verdict on any defendant on any count. Bear in mind, however, that once you report a partial verdict you cannot change any part of it even if you continue to deliberate as to the counts on which you have not reached a decision.
> "Also, after reporting a partial verdict, should you choose that course, you may be asked to continue your deliberations concerning the unresolved counts.

9

> "If you decide to report a partial
> verdict, after hearing what the verdict is,
> and consulting with the lawyers in the case,
> I will decide whether or not to ask you to
> continue your deliberations."

Tr. at 3967-69.  After receiving the Judge's instruction, the jury returned to the jury room where it deliberated for the remainder of the day.

The jury entered its tenth and final day of deliberations on February 27.  At approximately 9:30 a.m., the jury sent a note to the court indicating that in light of the previous day's instructions on partial verdicts, it was prepared to deliver a decision on the counts on which it was unanimous.  The note read:

> "Judge Buchwald, as you directed us yesterday
> on the partial verdicts we, the jurors have
> agreed to give you our decision on some of
> them.  Can you let us know how to proceed.
> Thank you. Fred."

Tr. at 3971-72.  The court sent the jury a blank verdict sheet and the instructions that it could return a partial verdict by filling out the sheet only for the defendants and counts for which it had reached a unanimous decision.  Tr. at 3973.  At 10:32 a.m., the jury returned 14 verdicts as to four of the six defendants.  Tr. at 3974-78.  No verdicts were returned with regard to defendant Francis Altieri.

Following the partial verdicts, the government moved for a mistrial, citing the nearly three weeks of deliberations following a three week trial, the jury notes expressing deadlock, and the view that further deliberations would be unproductive.

10

Tr. at 3979.  Counsel for defendants Christopher Colombo, Anthony

Colombo, and Joseph Flaccavento voiced their consent to a

mistrial.* Tr. at 3979-81.  Counsel for Francis Altieri objected

to the Court declaring a mistrial and asked the Court to give the

jury an *Allen* charge.  Tr. at 3981.  In response to Altieri's

request for an *Allen* charge, the Court expressed its skepticism

about the efficacy of such a charge at this stage of

deliberations, stating:

> "I don't personally believe that there
> is going to be any change based on the note
> from yesterday and the amount of time that's
> already been spent and given the nature of
> the issues.
> "It's personally hard for me to
> understand how they could have spent this
> much time already."

Tr. at 3982.  The government, noting that it was within the

Court's discretion to give the jury an *Allen* charge, opposed such

an instruction as fruitless.  Tr. at 3982.

Searching for a possible alternative to a mistrial

declaration, the Court then proposed that the parties consider

whether the jury should be instructed to continue to deliberate

with respect to Altieri alone:

> "Has anyone heard of, and I can't say
> that I have, a direction to the jurors to
> continue to talk about one defendant?
> [...]
> "So my question is, given the split, has
> anyone ever heard of a jury being told that
> there is a request for you to continue to
> deliberate with respect to one defendant or

---

\* Defendant Nunzio Flaccavento was acquitted on all
charges against him.

certain counts and send them off with that
direction and some version of an *Allen*
charge?
"I just toss that out because the
thought crossed my mind, given the way the
views of counsel have split. I have no idea
if that's totally improper, unheard of,
problematic in a million different ways, or
actually, once voiced, something that Mr.
Cagney and Mr. Altieri actually want."

Tr. at 3983. The Government responded by raising the concern

"that the jury might interpret that [instruction] as a message

that they should reach a verdict on Mr. Altieri since the Court

is specifically directing them so we would be concerned if they

came back with a conviction on Mr. Altieri." Tr. at 3984. The

Government further raised the concern that this unorthodox

instruction would create an appellate issue. Tr. at 3984.

After a recess, the court revisited the issue of Mr.

Altieri's objection to a mistrial. Importantly, counsel for Mr.

Altieri stated that "while we like your idea, we would like to

proceed and ask the jury to deliberate further." Tr. at 3992.

The Court decided that the alternative of instructing the jury to

continue to deliberate only with respect to Altieri was

untenable:

"Let me tell you why I think it's a very
bad idea for your client, and I am not going
to do it. I, too, have the opportunity when
I leave the bench to call higher authorities,
at least more experienced judges, and I did
that.
"The one I got to really told me why it
was a terrible idea. Because if I do this,
the subliminal message to the jury is I
understand why you couldn't reach a verdict
with respect to the remaining counts for Mr.
Colombo, the two Colombos, Joseph

12

> Flaccavento, and I guess there's a remaining
> count for Mr. Berlingieri, but I don't really
> get why you couldn't do it on Mr. Altieri.
> Since you are going to now focus on Mr.
> Altieri, the subliminal message is there's
> enough evidence to convict him.
>  "So I don't want to do that for your
> client because that will be the message.  I
> understand all your other problems, but I
> don't quite get if for Mr. Altieri.  The only
> conclusion from that is there's enough
> evidence to convict him.
>  "So, we all benefit from asking higher
> authorities and more experienced people.
> Beyond the fact that this judge, who has a
> tremendous amount of prosecutorial and
> judicial experience has never heard of any
> such thing, but that was the reason it was a
> bad idea, I am not about to put Mr. Altieri
> into that situation.  I think judging from
> his nodding he appreciates it actually.
>  "Mistrial is declared."

Tr. at 3992-93.  Having declared a mistrial, Judge Buchwald
called the jury into the courtroom to be dismissed, explaining to
them that "we are in agreement that requiring you to deliberate
further would not be productive."  Tr. at 3993-94.  Following the
dismissal of the jury and a brief discussion of bail and
scheduling issues, the trial concluded.

   **B.   Applicable Law**

   The Double Jeopardy Clause permits a defendant to be retried
in two circumstances: (1) if he consented to a mistrial in his
prior trial; or (2) absent consent, if "manifest necessity" or
"the ends of justice" warranted terminating the first trial. *See,
e.g., United States* v. *Perez*, 22 U.S. 579, 580 (1824); *United
States v. Williams*, 205 F.3d 23, 36 (2d Cir. 2000) ("When a
defendant fails to consent to a trial court's declaration of a

mistrial, double jeopardy will bar a second prosecution unless there was a manifest necessity for the mistrial") (internal citation omitted). It is equally well established that the failure of a jury to agree on a verdict constitutes manifest necessity, such that double jeopardy principles pose no bar to retrial. The Supreme Court reiterated this long-standing rule in *Richardson* v. *United States*, 468 U.S. 317, 323-24 (1984):

> It has been established for 160 years, since the opinion of Justice Story in *United States* v. *Perez*, that a failure of a jury to agree on a verdict was an instance of manifest necessity which permitted a trial judge to terminate the first trial because the ends of justice would otherwise be defeated. Since that time . . . . we have constantly adhered to the rule that a retrial following a hung jury does not violate the Double Jeopardy Clause.

Indeed, "[a] mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has] long [been] considered the classic basis for a proper mistrial." *Arizona* v. *Washington*, 434 U.S. 497, 509 (1978); *see also, e.g., United States* v. *Joyner*, 201 F.3d 61, 83 (2d Cir. 2000); *United States* v. *Chestaro*, 197 F.3d 600, 609 (2d Cir. 1999); *Arnold v. McCarthy*, 566 F.2d 1377, 1386 (9th Cir. 1978).

The trial judge is accorded "broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury," and the judge's "decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." *Arizona* v. *Washington*, 434 U.S. at 509-10. There are no mechanical rules by which a trial judge must

determine whether or not a jury is deadlocked, though courts have identified several factors that may inform the court's determination.  These factors include the jury's collective opinion of disagreement, the length and complexity of trial, the length of deliberations, the jury's communications with the court, and the coercive impact of future deliberations.  *See United States* v. *Byrski*, 854 F.2d 955, 961-63 (7th Cir. 1988); *Arnold* v. *McCarthy*, 566 F.2d 1377, 1386-87 (9th Cir. 1978).  Of these factors, the most important indication of true deadlock is the jury's own statements.  *See Byrski*, 854 F.2d at 961 ("the most critical factor is the jury's own statement that it was unable to reach a verdict"); *McCarthy,* 566 F.2d at 1387.  When the trial court declares a mistrial over the objection of the defendant, the trial judge's declaration of mistrial is reviewed for an abuse of discretion.  *Arizona* v. *Washington*, 434 U.S. at 514; *see also United States v. Millan*, 17 F.3d 14, 20 (2d Cir. 1994).

In addition to the broad discretion that the trial judge exercises in declaring a mistrial due to a hung jury, the trial judge need not use specific language or make an exhaustive articulation of his or her findings in justifying a mistrial. The Supreme Court made clear in *Arizona* v. *Washington* that:

> "[A] judge's mistrial declaration is not subject to attack...simply because he failed to find 'manifest necessity' in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion."

434 U.S. at 517.  Moreover, the trial court need not make

specific findings regarding alternatives to a mistrial when no
reasonable alternatives exist. *See United States* v. *Grasso*, 552
F.2d 46, 52-53 (2d Cir. 1977), *vacated for additional findings,*
438 U.S. 901 (1978) ("the double jeopardy clause will not bar
retrial even though [an] examination of alternatives ... is not
undertaken if to do so would be futile because clearly no
reasonable alternative existed") (citing *Illinois* v. *Somerville*,
410 U.S. 458 (1973)); *Dunkerley v. Hogan*, 579 F.2d 141, 147 (2d
Cir. 1978) ("We recognize that where the record discloses
plausible reasons supporting the declaration of a mistrial the
trial judge may not be required to state his reasons").

In contrast to situations where evidentiary or witness
issues arise during trial, when a trial court is confronted with
a deadlocked jury, the court has little or no alternative to
declaring a mistrial. The law is clear that "a hung jury is the
most common example of circumstances in which the need for a
mistrial is manifest." *United States* v. *Huang*, 960 F.2d 1128,
1135 (2d Cir. 1992). The requirement that a trial judge consider
alternatives to a mistrial is most applicable to cases where
witness or juror issues have arisen, the defendant or a party
becomes ill, or where a procedural defect has tainted the
proceedings. *See, e.g., United States v. Bates*, 917 F.2d 388,
397 (9th Cir. 1990) (additional witness testimony to correct
effects of prejudicial testimony was an alternative to a
mistrial); *Dunkerley,* 579 F.2d at 144 (where defendant became ill
during trial, trial continuance was an alternative to mistrial);

*Grasso,* 552 F.2d at 54 (where a witness recanted testimony, alternatives to a mistrial included further cross-examination, granting immunity to witness in order to secure testimony, admitting recorded conversation, striking tainted testimony).

## C.   Discussion

### 1.   The Trial Court's Mistrial Declaration Was Supported By Manifest Necessity Because It Was A Sound Exercise Of Judicial Discretion

This Court properly exercised its discretion to declare a mistrial after the jury was deadlocked in this case. Accordingly, Judge Buchwald's mistrial declaration was compelled by manifest necessity, and Altieri's argument that his reprosecution is barred on the basis of double jeopardy should be rejected.

A trial judge's decision to declare a mistrial because of a hung jury is subject to tremendous deference. *United States* v. *Millan*, 17 F.3d 14, 19-20 (2d Cir. 1994) ("a trial judge is best situated to decide intelligently whether 'the ends of substantial justice cannot be attained without discontinuing the trial'"); *White v. Keane*, 969 F.2d 1381, 1382-83 (2d Cir. 1992) (a judge's determination that the jury is deadlocked should be "accorded great deference by a reviewing court") (quoting *Arizona v. Washington*, 434 U.S. 497, 509-10 (1978)).

The Supreme Court stated in *Gori v. United States*, 367 U.S. 364, 368 (1961), "This Court has favored the rule of discretion in the trial judge to declare a mistrial and to require another

panel to try the defendant if the ends of justice will be best served . . . and that we have consistently declined to scrutinize with sharp surveillance the exercise of that discretion."

The Supreme Court also has clearly stated the rationale behind the substantial deference given to a trial judge's exercise of discretion in granting a mistrial:

> If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently than a trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

*Arizona v. Washington*, 434 U.S. 497, 509-10 (1978).

A judge's mistrial declaration due to a deadlocked jury is proper when supported by evidence of the jurors' inability to reach a verdict or the futility of further deliberations.  The law is clear that such a declaration should not be disturbed by a reviewing court absent an abuse of discretion.  *See, e.g., United States* v. *Joyner*, 201 F.3d 61, 83 (2d Cir. 2000) (mistrial declaration proper when jury failed to return a verdict "after protracted deliberations and in spite of the court's *Allen* charge"); *United States* v. *Williams*, 205 F.3d 23, 36 (2d Cir. 2000) (mistrial declaration proper when "jurors deliberated for over two days" despite "relatively simple" trial, and indicated four times that they were unable to reach a verdict); *United*

*States* v. *Rosa*, 17 F.3d 1531, 1540-41, (2d Cir. 1994) (mistrial declaration was proper over defendants' objection, when jury deliberated for four days, indicated deadlock on three occasions, and received an *Allen* charge); *United States* v. *Goldstein*, 479 F.2d 1061, 1068-69 (2d Cir. 1973) (mistrial declaration proper when jury "twice reported itself unable to agree" during eight hours of deliberations in a complex case with "almost 50 possible verdicts").  The law is clear, therefore, that "a jury's genuine inability to agree on a verdict constitutes 'manifest necessity' warranting the declaration of a mistrial" because requiring a jury to continue deliberations in certain cases may "defeat[ ] the ends of public justice [by] wast[ing] valuable judicial resources [and] coerc[ing] erroneous verdicts."  *Goldstein,* 479 F.2d at 1068.

Moreover, "it is well recognized that a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment."  *United States* v. *Millan*, 17 F.3d at 19; *United States* v. *Rosa*, 17 F.3d at 1540 (affirming Judge Martin's declaration of a mistrial, over defendants' objections, where jury was deadlocked after four days of deliberations).

In this case, the Court properly concluded, on the basis of ample evidence, that a mistrial declaration was warranted because the jury was genuinely unable to reach a unanimous verdict on the counts against Altieri.  The jury had sent three notes specifically indicating its inability to reach a unanimous

verdict as to several of the charges.  This includes the jury's third and final note, sent on February 26, stating that after reviewing all of the evidence, "we are still unable to reach a unanimous decision on some counts," and that "none of us feel there is any hope of changing our minds since they are made up." Tr. at 3961.  This Court had not one – but three – clear statements from the jury that despite protracted deliberations they were unable to reach a verdict as to Altieri.

Furthermore, Judge Buchwald's finding of that the jury was deadlocked, and that a mistrial should be granted, was supported by several other aspects of the record.  In addition to the several notes clearly indicating their deadlock, the jury delivered a partial verdict on February 27, in response to Judge Buchwald's instruction that the jury could return a partial verdict "on any defendant on any count [for which there was a unanimous decision]," Tr. at 3967.  This clearly indicates that the jury was genuinely unable to reach a unanimous decision as to the remaining counts.  Furthermore, the prolonged length of deliberations (9 days) as compared to the length and complexity of the trial indicate that the jury's attempt to reach a unanimous verdict was both bona fide and genuinely unsuccessful. The length of jury deliberations as compared to the length and complexity of trial supported the proper exercise of judicial discretion in declaring a mistrial.  *See Joyner*, 201 F.3d at 83; *Williams*, 205 F.3d at 36; *Rosa*, 17 F.3d at 1540; *Goldstein*, 479 F.2d at 1069.  In fact, this Court specifically cited the jury's

sustained deliberations in finding a manifest necessity for a
mistrial, stating:

> "this is the ninth day of deliberations on a
> trial that had 21 days of testimony... [and]
> I don't personally believe that there is
> going to be any change based on the note from
> yesterday and the amount of time that's
> already been spent and given the nature of
> the issues."

Tr. at 3981-82. Moreover, all of the defendants except for
Altieri agreed that giving the jury an *Allen* charge would be
unproductive. The government, in arguing against giving an *Allen*
charge on the final day of deliberations, pointed out uncontested
that "the government and three of the four defense counsel seem
to agree that at this point [an *Allen* charge would] be
fruitless." Tr at 3982. This Court similarly concluded that
giving the jury an *Allen* charge would likely do little to resolve
the deadlock, Tr. at 3982, and that "requiring [the jury] to
deliberate further would not be productive," Tr. at 3993-94.

Despite Altieri's arguments to the contrary, giving the jury
an *Allen* charge is not a necessary condition for finding a jury
genuinely deadlocked. The decision whether to give an *Allen*
charge is in the discretion of the district judge, and nothing
requires a trial court to attempt to induce unanimity through
such a charge. *See United States* v. *Crispo*, 306 F.3d 71, 76-77
(2d Cir. 2002) (decision to give *Allen* charge reviewed for abuse
of discretion, and requires "individualized determination")
(quoting *United States* v. *Robinson*, 560 F.2d 507, 517 (2d Cir.
1977)). It was well within this Court's discretion to conclude

that further deliberations "would not be productive." Tr. at 3994.

The Court's decision not to Allen charge the jury and, instead, to declare a mistrial was fully supported by the record and well within the Court's discretion. *See Goldstein*, 479 F.2d at 1069 (propriety of declaring mistrial based on jury deadlock is best left to trial judge, and "difficult to gauge by another district judge or by appellate judges on a cold record").

### 2. The Court's Declaration of a Mistrial In This Case Did Not Necessitate A Consideration Of Alternatives

Although Altieri's motion relies heavily on the assertion that "a finding of 'manifest necessity' requires a trial court to consider alternatives" to a mistrial, Altieri Br. at 13, this assertion is a fatally incomplete statement of the law. The requirement to consider alternatives to a mistrial is significantly curtailed when the trial record indicates adequate grounds for the trial court's mistrial declaration or when no viable alternatives to mistrial exist in the first place. *See Arizona* v. *Washington*, 434 U.S. 497 at 516-17 (the Constitution does not require extensive findings in support of a mistrial declaration when the record discloses adequate bases for the mistrial); *see also United States* v. *Grasso,* 552 F.2d at 53, (trial court need not make specific findings regarding alternatives to a mistrial when no reasonable alternatives exist).

No alternatives to a mistrial existed in this case when the

Court was faced with a jury that had deliberated for nine days and repeatedly indicated that it was deadlocked. Although a trial court has many alternatives when faced with the unavailability of witnesses or counsel, or other evidentiary issues, where there is a deadlocked jury, there are few corrective measures that a trial court can employ. A judge faced with a hung jury has only two options - further deliberations or a mistrial. When the record supports an adequate basis for the conclusion that further deliberations or an *Allen* charge would not be productive, a trial court's sole remedy becomes the declaration of a mistrial.

### 3. Even If Consideration Of Alternatives Were Required In This Case, The Trial Court's Consideration, And Rejection, Of The Proposed Alternatives Was Sufficient

The record shows that this Court, faced with a hung jury after nine days of deliberations, three jury notes indicating deadlock, and a partial verdict, properly exercised its discretion by declaring a mistrial.

Altieri contends that there were two alternatives to a mistrial that the trial court should have considered: (1) instructing the jury to continue deliberations on all unreturned counts as to all remaining defendants, or (2) instructing the jury to continue deliberations as to defendant Altieri alone. The first option, either accompanied by an *Allen* charge or alone, was adequately considered by the this court and rejected. Judge Buchwald specifically cited the protracted length of deliberations as compared to the length of trial, as well as the

jury's own statements regarding its deadlock, Tr. at 3981-82, in finding that additional deliberations "would not be productive," Tr. at 3994. Moreover, none of the other defendants wanted the jury to continue to deliberate; all of the defendants, other than Altieri, agreed with the Court that a mistrial should be declared.

With respect to the alternative of giving the jury an *Allen* charge relating only to Altieri and instructing the jury to continue it deliberations only with respect to him, the record is clear that this Court fully considered and rejected this alternative. Given that the jury had been deliberating for nine trial days and that the jury indicated on several occasions that it was deadlocked, it was certainly within the Court's discretion to reject the unorthodox approach that Altieri wanted. In fact, in addition to the conclusion that it would not be "productive" to have the jury continue its deliberations, the Court also concluded that sending the jury back to deliberate as to Altieri alone could send the jury a powerful and improper signal to convict Altieri. Tr. at 3984, 3992-93. Specifically, the Court concluded that declaring a mistrial as to the remaining defendants but sending the jury back to deliberate as to Altieri alone would send the jury the message that, in essence, said, "I understand why you couldn't reach a verdict with respect to the [other defendants]. . . but I don't really get why you couldn't do it on Mr. Altieri. Since you are going to now focus on Mr. Altieri, the subliminal message is there's enough evidence to

convict him." Tr. at 3992-93. Therefore, contrary to Altieri's assertions that this Court did not adequately consider alternatives to a mistrial, the record makes clear that the Court fully considered and rejected the option of instructing the jury to deliberate only as to Altieri.

The Court acted well within its discretion when it declared a mistrial with respect to Altieri. The law is clear that a defendant's "right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *United States* v. *Jorn,* 400 U.S. 470, 480 (1970) (quoting *Wade* v. *Hunter*, 336 U.S. 684, 689 (1949)) (internal quotation marks omitted). The mere fact that Altieri requested an "unprecedented" alternative, Tr. at 3997, that the jury continue to deliberate solely with respect to him, does not mean that he is entitled to such relief or that his Constitutional rights were violated when the Court declared a mistrial over his objection. The Court ruled that pursuing such an unprecedented alternative to a mistrial, with a jury who had been deliberating for nine days, could produce a unfair and unjust verdict. Therefore, the record is clear that this Court sufficiently considered and rejected Altieri's proposed alternative to a mistrial.

The Court did not err in declaring a mistrial with respect to Altieri and Altieri's motion to dismiss the indictment should be denied.

## II.  Defendant Joseph Flaccavento's Rule 29 Motion
## Should Be Denied

Defendant Joseph Flaccavento moves for a judgment of acquittal on all the counts against him in the Indictment pursuant to Federal Rule of Criminal Procedure 29.  This Court has previously – and correctly – denied Flaccavento's Rule 29 motion.  At trial, the Court ruled – on two separate occasions – that the Government had met its burden of presenting sufficient evidence for these counts to go to a jury.  Flaccavento now presents only one new argument: that the racketeering enterprise had no effect on interstate commerce.  This contention is easily defeated.  Thus, Flaccavento has provided no basis for the Court to reverse its earlier decision.  Accordingly, the Court should deny Flaccavento's motion.

### A.  Relevant Facts

At trial, the jury deadlocked on all Counts related to Defendant Joseph Flaccavento.  The Counts charging Flaccavento were: Count One (RICO Substantive), including Racketeering Act ("R.A.") 2 (conspiracy to make extortionate extensions of credit or conspiracy to collect extensions of credit by extortionate means), and RA 3 (making extortionate extensions of credit to John Sitterly and Richard Kelly or collection of extensions of credit by extortionate means from John Sitterly and Richard Kelly); Count Two (RICO conspiracy); Count Five (conspiracy to make extortionate extensions of credit); Count Six (conspiracy to collect extensions of credit by extortionate means); Count Seven

(making extortionate extensions of credit to John Sitterly and Richard Kelly); and Count Eight (collection of extensions of credit by extortionate means from John Sitterly and Richard Kelly).

The Government presented evidence on these Counts through several different means, including audio recordings of Flaccavento, witness testimony, and documentary evidence. First, and most importantly, the jury heard approximately 20 audio recordings of cooperating witness John Sitterly meeting with or talking to Flaccavento and Christopher Colombo. These recordings allowed the jury to hear Flaccavento, in his own words, discussing the loansharking payments that Sitterly owed to Flaccavento and Christopher Colombo. The recordings included conversations about points (the exorbitant interest rate on the loans), GX 936-T, Sitterly's asking Flaccavento for a new loan, GX 937-T, Flaccavento's pressuring Sitterly to make the weekly juice (or interest) payments, *see, e.g.,* Tr. at 1124, and Flaccavento's delivering messages from his boss Christopher Colombo to Sitterly: "We won't tell him. We will show up at his house tonight" Colombo said, as reported to Sitterly by Flaccavento. GX 943-T. The recordings provided compelling evidence of the loansharking payments Sitterly had to make to Flaccavento and Colombo.

And the jury also heard testimony from witnesses. New York State Police Investigator Anthony Vanturini testified that he surveilled Sitterly meeting with Flaccavento. Tr. at 698. He

testified that these meetings were about Sitterly's loansharking payments to Flaccavento and Christopher Colombo. The loansharking expert witness, John Carillo, testified after hearing some of the audio recordings, that the discussions about points on the recordings made it clear to him, in his expert opinion, that the conversations pertained to loansharking debts. Tr. at 1026-27.

And the jury also saw powerful physical evidence pertaining to Flaccavento's role in the loansharking conduct. Most notably, the jury saw that: there was $1500 in United States currency, whose serial numbers were recorded by a law enforcement agent, and that that money was given by the agents to Sitterly to give to Joseph Flaccavento. As Investigator Vanturini testified, Sitterly was given that $1,500 before he had a meeting with Flaccavento on May 15, 2001. Tr. at 910. And as New York Organized Crime Task Force Investigator John O'Connor testified, when he searched Christopher Colombo's house the very next day, agents recovered, among many other piles of cash, $1100 of the $1500 that Sitterly had given to Flaccavento. Tr. at 952; *see also* Mike Truncale testimony, Tr. at 1476-78; GX 800 & 801.

**B.   Applicable Law**

When considering a defendant's motion for acquittal under Federal Rule of Criminal Procedure 29, the Court must view the evidence "in the light most favorable to the government." *United States* v. *Zagari*, 111 F.3d 307, 327 (2d Cir. 1997); *accord*, *e.g.*, *United States* v. *Torres*, 901 F.2d 205, 216 (2d Cir. 1990).

Additionally, "all reasonable inferences are to be resolved in favor of the prosecution." *United States* v. *Rodriguez*, 702 F.2d 38, 41 (2d Cir. 1983) (quoting *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir. 1980)). "The verdict will be sustained unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zagari*, 111 F.3d at 327 (internal quotation omitted). A defendant challenging the sufficiency of the evidence supporting his conviction "bears a very heavy burden." *United States* v. *Scarpa*, 913 F.2d 993, 1003 (2d Cir. 1990) (citations omitted).

**C. Discussion**

At trial, the Court ruled – on two separate occasions – that the Government had met its burden of presenting sufficient evidence for these counts to go to a jury.

After the Government rested, the Court heard lengthy arguments on Flaccavento's Rule 29 Motion and denied the motion in its entirety. (Tr. at 2366-2382). The Court rejected Flaccavento's arguments, stating that he could make those arguments to the jury, and that the Government had sustained its burden. For example, regarding the RICO conspiracy counts, the Court specifically stated that whether Flaccavento was an employee of or received payment from Christopher Colombo was a question that should be presented to the jury: "That's an argument you can make to the jury, but that really doesn't wind up supporting a dismissal of the count." (Tr. at 2379-80).

In addition, at the close of all evidence, Flaccavento

renewed his motion for a judgment of acquittal, despite the fact that he did not put on any witnesses or offer any evidence.  The Court again denied the motion with regard to all counts relating to Defendant Joseph Flaccavento.  (Tr. at 3165).

In Flaccavento's Rule 29 Motion, he offers one new argument: that no evidence was presented to establish that the criminal enterprise had an effect on interstate commerce.  *See* Flaccavento Br. at 5-6.  This claim is unavailing.

As a preliminary matter, the Court instructed the jury on the low threshold required for the Government to establish that the enterprise had an effect on interstate commerce:

> This effect on commerce could have occurred in any way, and it need only have been minimal.
>
> You need not find a substantial effect on interstate or foreign commerce.  Nor is it necessary for you to find that the defendant you are considering knew the enterprise was engaged in interstate or foreign commerce.  Nor is it necessary that the effect on commerce was adverse to commerce.  All that is necessary is that the activities of the enterprise affected interstate or foreign commerce in some minimal way.  It is sufficient, for example, that, in the course of the racketeering activities, members of the enterprise traveled interstate themselves or used telephone facilities interstate.

(Tr. at 3758).

The Government clearly met its burden of present sufficient evidence for a rational trier of fact to find that the interstate commerce element had been satisfied.  Most conspicuously, the enterprise's actions in relation to DoubleClick, a company with offices around the United States and overseas, satisfies the element that the enterprise had an effect on interstate or

foreign commerce.[*] For example, the testimony of Steven Collins, a former DoubleClick Chief Financial Officer and Chief Information Officer, established that DoubleClick had a data backup center in Thornton, Colorado during the time that Mr. Collins worked for the company. (Tr. at 1848). This testimony was corroborated and supplemented by invoices and checks indicating that several of the double billings of DoubleClick perpetrated by John Contino, a member of the enterprise, and Francis Altieri, related to bills for cleaning and rubbish removal services at DoubleClick's facility located at 12396 Grant Street, Thornton, Colorado, by XYZ Maintenance/Construction Corp. ("XYZ"), Contino's Staten Island, New York company. (*See* GX 314-A through 314-D). This evidence clearly would allow a rational trier of fact to conclude that the enterprise had at least a "minimal" effect on interstate commerce.

In sum, the Court has already denied Flaccavento's Rule 29 motion twice at trial, and rightly so. Flaccavento presents no new argument that warrants any other outcome. Accordingly, the Government respectfully submits that the Court should deny Flaccavento's Rule 29 motion.

---

[*] Indeed, one of the defense witnesses was a DoubleClick employee who worked overseas in the company's London office. Tr. at 2768-71.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that this Court deny the defendants' motions.

Dated:    New York, New York
         June 28, 2007

                    Respectfully submitted,

                    MICHAEL J. GARCIA
                    United States Attorney


By:_____
      LISA A. BARONI
      JASON P.W. HALPERIN
      Assistant United States Attorneys
      Tel. No.: (212) 637-2405 / 2643