# ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN
JEREMY SCHNEIDER
ROBERT A. SOLOWAY
DAVID STERN

Tel: (212) 571-5500
Fax: (212) 571-5507

February 22, 2008

**VIA ECF and BY HAND**

Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  United States v. Anthony Colombo
     **Including Christopher Colombo**
     04 Cr. 273 (NRB)

Dear Judge Buchwald:

As you know, I represent Christopher Colombo in the above-referenced matter. Mr. Colombo is presently scheduled for sentencing before your Honor on March 6, 2008 at 4:30 p.m., following his conviction after trial of one count of Operation of an Illegal Gambling Business in violation of 18 U.S.C. §§ 1955, 2 and one count of Conspiracy to do the same in violation of 18 U.S.C. § 371.[1] I write on the matter of Mr. Colombo's sentence to respectfully request that your Honor sentence Mr. Colombo to a reasonable, non-Guidelines sentence of probation.

Mr. Colombo and I have reviewed the Pre-Sentence Report ("PSR") dated January 18, 2008 and prepared by USPO Ross Kapitansky. We informed Mr. Kapitansky of our objections to the PSR in correspondence dated February 4, 2008. This letter will address some of those objections, including objections to Mr. Colombo's offense level calculation, in more depth. To the extent other objections are not reflected in changes to the final PSR, we will address them at sentencing. This letter also

---

[1] It should be noted that, as will be discussed in this letter, Mr. Colombo conceded his involvement in those offenses both before trial and at trial during opening and closing statements.

Hon. Naomi R. Buchwald
February 22, 2008
Page Two

includes a motion for a downward departure pursuant to 5K2.0(a)(2)(B), as well as a discussion of the application of the 18 U.S.C. § 3553 factors to Mr. Colombo.

     As an initial matter, we wish to point out that for the duration of this case, whether negligently, recklessly or intentionally, the government has consistently mislead this Court regarding the true nature of this case and of the defendant. It is respectfully submitted that the shadow cast by the government's inaccurate and distorted representations should be kept in mind as your Honor determines what sentence is most appropriate for Mr. Colombo.

I.   <u>Offense Level Calculation</u>

     The PSR incorrectly calculates Mr. Colombo's offense level to be 16. This calculation begins with a base offense level of 12 and includes a 4 level upward adjustment for role in the offense, thereby resulting in an offense level 16 and an advisory Guidelines range of 21 to 27 months. Moreover, the PSR calculation does not include a 3 level downward adjustment for acceptance of responsibility.

    A.   <u>Adjustment for Role in the Offense</u>

     While it is not contested that Mr. Colombo had some supervisory role in this offense, that role was not his alone and certainly did not rise to a level meriting a 4 level upward adjustment. Eddie Robinson, who pleaded guilty before the Honorable James C. Francis IV on March 16, 2006 to the same counts of which Mr. Colombo is convicted, and who was sentenced by your Honor on July 13, 2006 to two years probation, including six months home confinement, was Mr. Colombo's partner in the gambling business. <u>See</u> PSR para. 46, 47 (describing intercepted telephone conversations between Mr. Colombo and Mr. Robinson wherein they discuss that day's results); <u>see also</u> GX 906-T (transcript of intercepted conversation between Mr. Colombo and Mr. Robinson wherein the following conversation took place:

        Robinson:    Hello?

        C Colombo:   Yeah, (UI) I, I was supposed to speak to you between 2:30 and 3. We did real good yesterday.

Hon. Naomi R. Buchwald
February 22, 2008
Page Three

| | |
|---|---|
| Robinson: | Oh that's nice. |
| C Colombo: | We win close to 70. |
| Robinson: | For the week? |
| C Colombo: | No, for yesterday. |
| Robinson: | Oh yesterday. Oh that's good. |
| C Colombo: | [Voice overlap] Yesterday. I think we were stuck 12 going in, but the good news is uh, Swifty lost 38 yesterday. |
| Robinson: | Terrific. |
| C Colombo: | That's the good news. |
| Robinson: | That, that uh, now I don't feel too bad. (Laughs) |

***

| | |
|---|---|
| C Colombo: | You know this is a, this is a frustrating - thank God we hit that late game. |
| Robinson: | Yeah, I had a big bet on it. |
| C Colombo: | You know where we would be right now? |
| Robinson: | (Laughs) |
| C Colombo: | Crying. |

***

| | |
|---|---|
| Robinson: | Yeah probably. Well that's good. I'm glad. That's very good news because of Swifty. Very good. |

GX 906-T); see also GX 907-T; GX 912-T; GX 931-T (transcripts of conversations between Mr. Colombo and Mr. Robinson relating to their gambling business). To the extent one exercised any leadership role, the other did not exercise any greater role.

Hon. Naomi R. Buchwald
February 22, 2008
Page Four

The background notes to Section 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G.") indicate that, at least in part, that section was created to address relative responsibility for an offense as well as public safety concerns. See U.S.S.G. § 3B1.1 cmt. background (2007). The background commentary to Section 3B1.1 goes onto say:

> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

U.S.S.G. § 3B1.1 cmt. background.

In this case, Mr. Colombo shared responsibility for the day-to-day operation of the gambling business. More importantly, in light of the trial evidence and the many years that Mr. Colombo has been under the Court's supervision without incident, Mr. Colombo poses no threat to the public. Although the gambling organization in this case involved more than five participants, in all other respects, it is more closely aligned with the nature of organizations contemplated by Section 3B1.1(c). Therefore, at most, Mr. Colombo should receive a 2 level enhancement for his role in the gambling business, resulting in an offense level of 14.

### B. Adjustment for Acceptance of Responsibility

The PSR denies Mr. Colombo a downward adjustment for acceptance of responsibility. Relying on the application notes following U.S.S.G. § 3E1.1, the Probation Officer defers to your Honor's judgment on this issue.

Mr. Colombo offered to plead guilty to the gambling charges against him from the very start. Long before this case went to trial, Mr. Colombo admitted his involvement in gambling activities and was willing to take responsibility for that conduct. Nevertheless, the government continued in its insistence that Mr. Colombo was responsible for much more and persisted in portraying Mr. Colombo as a dangerous and violent

Hon. Naomi R. Buchwald
February 22, 2008
Page Five

loanshark. However, at trial, and consistent with prior representations to the Court and to the government, Mr. Colombo conceded his involvement in gambling activities in both opening and closing statements. Thus, Mr. Colombo was unwavering in his acceptance of responsibility for gambling.

After a six week trial, the jury found Mr. Colombo guilty of only the gambling counts. On all other counts, Mr. Colombo was found either not guilty, or the jury hung eleven to one for not guilty. Therefore, denying Mr. Colombo a downward adjustment for acceptance of responsibility amounts to penalizing him for the government's blind insistence that the matter proceed to trial on the more serious charges. Indeed, in this case, it is the government who failed to spare the Court's time and expense.

The PSR suggests that pursuant to U.S.S.G. § 3E1.1, application note 1(b), your Honor may wish to consider that at the time of the pre-sentence interview, Mr. Colombo tested positive for cocaine in evaluating whether he should receive points for acceptance of responsibility. However, it is respectfully submitted that it is unlikely that application note 1(b) was directed at circumstances such as those presently before your Honor. Mr. Colombo has been under strict pre-trial supervision since at least 2004. He did not violate any conditions of his release and brought all requests for modification of those restrictions before the Court for approval. Therefore, your Honor should focus your consideration of Mr. Colombo's acceptance of responsibility on the totality of his behavior during the unusually lengthy time that this matter has been pending.

Based on Mr. Colombo's consistent and ongoing acceptance of responsibility for gambling activities, his only offenses of conviction, Mr. Colombo should be granted a 3 level downward adjustment for acceptance of responsibility.[2]

---

[2] Whether Mr. Colombo is entitled to a 2 or 3 point decrease will depend on your Honor's determination with respect to the enhancement for Mr. Colombo's role in the offense. Pursuant to U.S.S.G. § 3E1.1(b), the additional 1 point decrease is only applicable where the offense level prior to consideration of acceptance of responsibility is 16 or greater. Although that subsection also provides that the additional 1 point decrease is on motion of the government, it is respectfully submitted that in a case such as this, the government was the obstacle to the defendant's pleading

Hon. Naomi R. Buchwald
February 22, 2008
Page Six

### C. Advisory Guidelines Calculation

Thus, Mr. Colombo's advisory Guidelines range should be:

| | |
|---|---|
| Base Level Offense | 12 |
| Adjustment for Role in the Offense | +2 |
| Adjustment for Acceptance of Responsibility | -2 |
| Total | 12 |

Therefore, Mr. Colombo respectfully requests that the Court begin its analysis based on an offense level of 12 and a Criminal History Category I, yielding an advisory Guidelines range of 10 to 16 months.

### II. Motion for a Downward Departure Pursuant to U.S.S.G. § 5K2.0(a)(2)(B) Based on Permanent Injury Suffered by the Defendant as a Result of Government Misconduct

Section 5K2.0(a)(2)(B) makes available downward departures based on circumstances not identified in the Guidelines and not adequately taken into consideration in determining the advisory Guidelines range applicable to a particular defendant.

After his indictment in this matter, Mr. Colombo was detained for just over two weeks. Over the government's objection, Mr. Colombo was released on a $1 million personal recognizance bond, signed by five financially responsible suretors and secured by $1 million in property and was subject to strict conditions of pre-trial supervision including home confinement and electronic monitoring. He was required to wear an ankle bracelet for purposes of electronic monitoring. As a result of the ankle bracelet being too tight, Mr. Colombo suffered permanent damage to his left foot and has a condition known as "drop foot" or cellulitis. Due to these injuries, Mr. Colombo, hospitalized for more than a week, no longer has full use of that foot. Letters from Mr. Colombo's doctors regarding this condition are annexed as Exhibit A. Medical records

---

guilty. Therefore, because the government precluded itself from avoiding trial preparation, Mr. Colombo should not be denied the additional 1 point decrease if it is otherwise applicable.

Hon. Naomi R. Buchwald
February 22, 2008
Page Seven

relating to Mr. Colombo's injuries are available upon the Court's request but as they are voluminous, are not included with this submission.

Mr. Colombo's stringent bail conditions, including electronic monitoring and the ankle bracelet, are the direct result of the government's misrepresentations to the Court. In arguing to keep Mr. Colombo in jail, the government took every opportunity to remind the Court how dangerous Mr. Colombo was and of his violent nature. The government opposed all applications to reduce the strict conditions of Mr. Colombo's bail. That opposition was always based on Mr. Colombo's purported danger to the community – it was never asserted that he was a flight risk. In support of its arguments, the government read from and referred to transcripts of intercepted phone conversations between Mr. Colombo and Randy Margulies and between Mr. Colombo's co-defendant, John Berlingieri and Mark LNU. See Transcript of Bail Hearing at 53-55, 57, April 5, 2004. The government continued to rely on those "victims" in its arguments to the Court on the matter of Mr. Colombo's bail, and even went so far as to play tape recorded conversations for your Honor. See Transcript of Detention Hearing at 4-5, August 18, 2004.

As your Honor is well-aware, the government's representations to the Court regarding those conversations were exaggerations and mischaracterizations not based in fact. Moreover, despite the purported importance of those tapes, the government failed to call either of those seemingly crucial witnesses to testify at trial. Rather, both Randy Marguiles and Mark LNU were called on the defense case. Through their testimony, they discredited the government's assertions about Mr. Colombo's activities and spotlighted the government's "stop at nothing" effort to paint Mr. Colombo as violent and dangerous. The jury acquitted Mr. Colombo of the counts where they were the alleged victims.

It should also be noted that the Marguiles family, including the "victim" Randy, was present at Mr. Colombo's bail hearing on April 9, 2004, and was prepared to post bail for the defendant. However, Magistrate Judge Francis was unwilling to allow them to do so because Randy Marguiles was characterized as a "victim" and thus, the family was also considered extended "victims" of extortion by Mr. Colombo, again, solely based on the government's misrepresentations. See Transcript of Bail Hearing at 7, April 9, 2004.

But for the government's representations to the Court, which were proven false by trial evidence and the trial verdict, Mr. Colombo would not have received such strict bail conditions. Thus, Mr. Colombo's bail conditions, far more severe than would ordinarily be imposed in a gambling case, amount to punishment imposed before a finding of guilty as to any count.

Moreover, Mr. Colombo will likely be punished for many years by the effect of the ankle bracelet which was improperly fitted to his leg by the United States government.

Therefore, based on the extreme and ongoing nature of the injuries suffered by Mr. Colombo as a result of charges for which he was never convicted, pursuant to U.S.S.G. § 5K2.0(a)(2)(B) he should be granted a downward departure to probation.

III. <u>18 U.S.C. § 3553(a): Reasonable Sentence</u>

Both the advisory Guidelines range of 21 to 27 months, based on the PSR's miscalculated offense level of 16 and Criminal History Category I, and the advisory Guidelines range of 10 to 16 months, based on an offense level of 12 and Criminal History Cateogry I as calculated by the defense, will result in an unreasonable sentence for Mr. Colombo. This is in light of the nature of the offense, Mr. Colombo's extreme bail conditions and resulting injury, as well as his personal history and family circumstances.

18 U.S.C. § 3553(a) states "[t]he court shall impose a sentence <u>*sufficient, but not greater than necessary*</u>, to comply with the factors set forth in" 18 U.S.C. § 3553(a)(2). These factors are retribution, deterrence, incapacitation, and rehabilitation. The language "sufficient, but not greater than necessary" is not simply another factor to be considered with the others, but sets an independent limit on the sentence a court may impose. <u>See</u> <u>United States v. Denardi</u>, 892 F.2d 269, 276-277 (3d Cir. 1989). In determining the sentence minimally sufficient to comply with the § 3553(a)(2) purposes of sentencing, the court must consider the following factors: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the kinds of sentences available; 3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range; 4) the need to avoid unwarranted sentencing disparity; and 5) the need to provide restitution where applicable. 18 U.S.C. § 3553(a)(1) & (2). Neither the statute nor <u>United States v.</u>

Booker and Fanfan, 125 S.Ct. 738 (2005) suggest that any one of these factors is to be given greater weight than any other factor. Therefore, after consideration of all the recited factors, the court has full discretion to sentence anywhere within the statutory range. Id. at 791 (Scalia, J., dissenting).

The Supreme Court's recent decisions in Kimbrough v. United States, 552 U.S. ___, 128 S.Ct. 558 (2007) and Gall v. United States, 552 U.S. ___, 128 S.Ct. 586 (2007), underscore the purely advisory nature of the Sentencing Guidelines and the deference afforded to sentencing judges. While "[a] district judge must include the Guidelines range in the array of factors warranting consideration . . . [t]he judge may determine . . . a within-Guidelines sentence is greater than necessary to serve the objectives of sentencing." Kimbrough, 552 U.S. at ___, 128 S.Ct. at 560; see also Gall, 552 U.S. ___, 128 S.Ct. 586 (" . . . the Guidelines are only one of the factors to consider when imposing sentence . . ." (Id. at ___, 128 S.Ct. at 602), and noting that a sentence outside the Guidelines range is not presumptively unreasonable. Id. at ___, 128 S.Ct. at 597).

### A. Nature and Circumstances of the Offense

Mr. Colombo was convicted after trial of one count of Operation of an Illegal Gambling Business in violation of 18 U.S.C. §§ 1955, 2 and one count of Conspiracy to do the same in violation of 18 U.S.C. § 371. The basis of the conviction is limited to Mr. Colombo's participation, with others, in running an illegal sports betting business. An admitted "bookie" and gambler, Mr. Colombo was convicted of what some might describe as his vice.

It should be noted that the indictment in this matter charged far more serious crimes, none of which were substantiated at trial. Nonetheless, the government vociferously argued in favor of detention, or alternatively, stringent bail conditions, based on those more serious charges and the unproven and inflammatory allegations as to Mr. Colombo's conduct.

### B. Personal History

Mr. Colombo was only nine years old when his father, Joseph Colombo, was shot at an Italian-American pride rally at Columbus Circle. As if such an incident was not enough for a child of that age to bear, his father remained in a coma for seven years,

Hon. Naomi R. Buchwald
February 22, 2008
Page Ten

ultimately dying. During those seven comatose years, Christopher's father remained in the family home where he was cared for. The devastating experience of losing his father at such a young age and under such uncommon circumstances, had a lasting effect on Mr. Colombo.

Mr. Colombo has four siblings: three brothers and one sister, most of whom live in close proximity to Mr. Colombo. As a result of this case, Mr. Colombo no longer has any relationship with his brothers, one of whom was a co-defendant, but he maintains a good relationship with his sister. See e.g., Letter of Catherine Dugan included in Exhibit B.

Mr. Colombo and his wife Suzanne were married in 1996 and have two children together, Katrina who is nine and Joseph who is four. Although their marriage has suffered tremendously as a result of this case, they work together to raise their children and attend marriage counseling in an effort to salvage their relationship. Notwithstanding any problems between Mr. Colombo and his wife, Ms. Colombo continues to describe Mr. Colombo as an excellent father with a close relationship to his children.

Above all, it is universally accepted and frequently acknowledged by all who know him, that Mr. Colombo is completely devoted to his children. He has created a home environment children dream of, complete with a jungle gym, farm animals, a large yard and numerous toys. Both of the children are under medical care, Katrina for life-threatening seizures which began after the inception of this case, and Joseph for problems resulting from the unequal growth of his legs. As a result, they often need extra care, from dealing with pain to visits to specialists to hospitalizations and potential surgery, which Mr. Colombo is always available to provide. His children depend on him as a father, as a companion and as a caretaker.

The impact of incarceration on Mr. Colombo's children would be immeasurable. On Mr. Colombo's recent business trip to California, his children were devastated, mistakenly thinking that he was away in jail. To remedy the situation, and to comfort his children, Mr. Colombo flew his wife and children to California to join him so that they could all be together.

Mr. Colombo's continuing presence in his children's life is no thanks to the government. Because of the government's insistence on Mr. Colombo's dangerousness, his family was nearly destroyed. In the early stages of this case, and due in large

part to misrepresentations made by the government, Ms. Colombo attempted to take their children and prevent Mr. Colombo from seeing them. The government provided (mis)information to Ms. Colombo's attorney during the litigation. Nevertheless, when the matter proceeded to court, and the judge was able to see Mr. Colombo for who he really was, the genuine love and devotion he showed for his children and the need the children showed for him, Mr. Colombo was ultimately awarded custody of the children and his family remained intact. A letter from Benjamin Ostrer, Esq. confirming this is annexed as Exhibit C.

Mr. Colombo is also universally described as generous and thoughtful. Letters from friends and neighbors who know Mr. Colombo from various aspects of his life and view him from different perspectives, are collectively annexed as Exhibit B. Among those letters is one from Barry Leeds who writes about his life-long friendship with Mr. Colombo who, in times of tragedy including the death of Mr. Leeds's young daughter, came to his aid, both emotionally and financially.

Karen Lee, Head of School of Children's Country Day School in New Windsor, New York where both of Mr. Colombo's children are students, writes of Mr. Colombo's dedication to making good choices for his children and to ensuring their success. Calling Mr. Colombo the "Pied Piper" of the school, she tells of his generosity to the school, both with his time and his financial resources, and the fondness felt for him by all the children.

Frederick Paige, a former New York State Corrections Officer, met Mr. Colombo through his auto detailing business. Mr. Colombo was a customer first, but soon after a friend. Mr. Paige details Mr. Colombo's support of his business and his support of Mr. Paige's family who were often invited to dine at the Colombo home. Mr. Paige clearly shares the belief of others that Mr. Colombo is a concerned and committed father who would be devastated if unable to care for his children for any period of time.

Mark O'Brien, a former Marine, has known Mr. Colombo since the late 1970s. Mr. O'Brien describes Mr. Colombo as a man mature beyond his years who can be counted on in difficult times. Mr. O'Brien further describes the courteous and respectful treatment Mr. Colombo gave Mr. O'Brien's daughter when the two dated, and the selfless way in which Mr. Colombo would take time to watch Mr. O'Brien's sons. In addition, Mr. O'Brien praises Mr. Colombo's devoted fathering.

Hon. Naomi R. Buchwald
February 22, 2008
Page Twelve

    William Fitch tells of Mr. Colombo's hospitality writing that when he was experiencing a difficult time in his personal life, "Chris would say, you have family here, don't be by yourself when you have family waiting for you here . . . anyone is welcomed at Chris' home during the holidays." Holidays are important to Mr. Colombo and he has made it his practice to make sure the holidays of others are as joyful as his. For the past three Christmases Robert Green writes about dressing as Santa Claus and visiting local hospitals with Mr. Colombo to give toys to children.

    Mr. Colombo's exemplary fathering is a benefit not only to his children, but to those around him. "Because of Chris's guidance, encouragement and example as a father I am able to appreciate both of my son's heroic accomplishments. I am a better father because of Chris," writes Sebastian D'Amico. And as to his own children, Lisa Riccardelli writes that she does not know what they would do without Mr. Colombo and lists "Joey and Catrina (his two beautiful children)" as reasons a more lenient sentence should be considered.

    The other letters included with this submission echo many of these sentiments leaving no doubt as to Mr. Colombo's nature and good character. His selflessness and generosity, as well as his attachment to his children and theirs to him, is evident in the way friends speak of him. Even his primary care physician of fifteen years, Dr. Arthur Klein describes Mr. Colombo as "not only generous to his friends but also to his family" noting the special attention Mr. Colombo devoted to his mother. He is held in high regard by people from all walks of life and who know him in all different capacities. Stewart A. Rosenwasser, a former County Court Judge and Acting New York State Supreme Court Justice who is presently practicing law and who has known Chris for approximately twenty-eight years both professionally and personally describes him as "often truthful to a fault." By and large, the good work and good deeds referred to in these letters pre-date this case. They are, therefore, a true reflection of Mr. Colombo's character, motivated only by his kind and generous nature.

    Mr. Colombo is a graduate of Marist College and has worked over the years in the construction and food industries. Mr. Colombo has always sought legitimate work, most recently appearing in an HBO reality television program, "House Arrest." That show marked the beginning of his professional television career and has sparked current industry interest in a reality

Hon. Naomi R. Buchwald
February 22, 2008
Page Thirteen

television series starring Mr. Colombo. To that end, Mr. Colombo recently visited Los Angeles, California with Christopher Gambale, a producer and director. The meetings Mr. Colombo attended during that trip were a success and there is genuine interest in producing the show soon. Unfortunately, if Mr. Colombo is sentenced to a period of incarceration, he may lose this once-in-a-lifetime opportunity. Letters from Mr. Gambale describing the idea for the program and his relationship with Mr. Colombo are annexed as Exhibit D.

    C.    <u>Retribution, Deterrence, Incapacitation and Rehabilitation</u>

A sentence of probation, below the advisory Guidelines range, would constitute a reasonable sentence, sufficiently punishing Mr. Colombo's present conduct, deterring any similar future conduct and would be commensurate with the seriousness of the crime, while adequately protecting the public. This sentence is appropriate for a gambling case under any circumstances but even more so in light of the specific facts of this case.

Mr. Colombo was subject to electronic monitoring and to wearing an ankle bracelet for approximately three years. He was under strict pre-trial supervision for three years and lived with the knowledge that he was under surveillance of some kind beginning in 2001 when search warrants were executed on his home and businesses. The events of the past seven years have given Mr. Colombo ample opportunity for rehabilitation which is evidenced in his pursuit of a career in television, far from the vices which led him to where we are today.

In addition, this case irreparably damaged Mr. Colombo's relationships with his brothers, and almost destroyed his immediate family. However, despite being alleged co-conspirators, Mr. Colombo and his brother were not convicted of any of the same charges. And furthermore, aside from the obvious fact that Christopher and Anthony Colombo are brothers, the two men were not linked by trial evidence in any ventures, criminal or otherwise.

Also as a result of this case, Mr. Colombo's relationship with his wife, while improving, is still strained. She now resides in the guest house of the home they once shared. While they are attempting to put back the pieces of their once solid relationship by going regularly to a marriage counselor and by spending more time together with their children, the damage has

Hon. Naomi R. Buchwald
February 22, 2008
Page Fourteen

been done. That damage stems directly from the government's unsubstantiated charges and innuendo.

The government attempted at every opportunity to taint this case with violence. Nevertheless, no violence by Mr. Colombo was ever proven. Without minimizing the seriousness of his conduct, Mr. Colombo poses no threat whatsoever to any individual or to society at large. Moreover, in his role as father and friend, he makes positive contributions to society which would be missed by those around him were he to be incarcerated even for a relatively short period.

Therefore, a sentence of probation would be sufficient to meet the goals of 18 U.S.C. § 3553.

D. <u>Guidelines</u>

Both the advisory Guidelines range calculated by the PSR of 21 to 27 months and the advisory Guidelines range calculated by the defense of 10 to 16 months are excessive for someone in Mr. Colombo's situation. A period of incarceration overlooks the true nature of his conduct, the devastating effect it would have on his two young children, and the extent of punishment already imposed in the form of unnecessarily strict bail conditions and resulting injuries. Moreover, Mr. Colombo stands poised to begin a career in television, a legitimate and lucrative field of work. A jail sentence could compromise his ability to pursue the opportunities presently before him and may result in that window closing, so to speak.

Hon. Naomi R. Buchwald
February 22, 2008
Page Fifteen

IV. <u>Conclusion</u>

For all the foregoing reasons, it is respectfully requested that your Honor sentence Mr. Colombo to a reasonable, non-Guidelines sentence of probation.

Thank you for your consideration of this matter.

Respectfully Submitted,

Jeremy Schneider

Encl.

cc: AUSA Lisa Baroni
    AUSA Jason Halperin
    USPO Ross Kapitansky

    Mr. Christopher Colombo

JS/auc